SAMUEL G. LIVERSIDGE (SBN 180578)
SLiversidge@gibsondunn.com
CHRISTOPHER CHORBA (SBN 216692)
CChorba@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA (SBN 254433)
DManthripragada@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071
Telephone: (213) 229-7000
Facsimile:  (213) 229-7520

Attorneys for Defendant,
HEWLETT-PACKARD COMPANY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re: HP INKJET PRINTER LITIGATION | Master File No. C05-3580 JF |
| | **DEFENDANT HEWLETT-PACKARD COMPANY'S STATEMENT IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| This Document Relates To: | |
| All Actions | |

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT .................................................................................................... 1

    A.    The Proposed Settlement Is Very Favorable To The Class Given The Considerable Risk Involved With Continued Litigation.................................. 2

    B.    The Settlement Benefits Provide Real Value To The Class—Particularly In Light Of The Substantial Hurdles To Continued Litigation ........................... 5

    C.    The Proposed Settlement Enjoys Overwhelming Support From The Settlement Class.................................................................................................. 8

    D.    The Settlement Is Entitled To A Presumption Of Fairness Because It Was Negotiated In Good Faith And At Arm's Length ...................................... 11

III. CONCLUSION ................................................................................................ 12

1

2

## TABLE OF AUTHORITIES

3

Page(s)

### Cases

4

*Alliance to End Repression v. City of Chi.*,
   91 F.R.D. 182 (N.D. Ill. 1981) ...................................................................................... 8

5

*Baggett v. HP*,
   No. 07-0667, 2009 U.S. Dist. LEXIS 95241 (C.D. Cal. Sept. 29, 2009) ...................... 5

6

*Bolger v. Bell Atl. Corp.*,
   2 F.3d 1304 (3rd Cir. 1993) ......................................................................................... 6

7

*Boyd v. Bechtel Corp.*,
   485 F. Supp. 610 (N.D. Cal. 1979) ............................................................................ 10

8

*Browning v. Yahoo! Inc.*,
   No. 04-1463, 2007 U.S. Dist. LEXIS 86266 (N.D. Cal. Nov. 16, 2007) .......... 3, 4, 7, 8

9

*Chin v. RCN Corp.*,
   No. 08-7349, 2010 WL 3958794 (S.D.N.Y. Sept. 8, 2010) ...................................... 6, 7

10

*Churchill Vill., L.L.C. v. Gen. Elec. Co.*,
   361 F.3d 566 (9th Cir. 2004) ...................................................................................... 5

11

*Class Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ................................................................................. 6, 8

12

*Clemens v. DaimlerChrysler Corp.*,
   534 F.3d 1017 (9th Cir. 2008) .................................................................................... 5

13

*Create-A-Card, Inc. v. Intuit, Inc.*,
   No. 07-6452, 2009 WL 3073920 (N.D. Cal. Sept. 22, 2009) ...................................... 9

14

*Dupler v. Costco Wholesale Corp.*,
   705 F. Supp. 2d 231 (E.D.N.Y. 2010) ........................................................................ 9

15

*Farinella v. Paypal, Inc.*,
   611 F. Supp. 2d 250 (E.D.N.Y. 2009) ...................................................................... 10

16

*Fernandez v. Victoria Secret Stores*,
   No. 06-4149, 2008 WL 8150856 (C.D. Cal. July 21, 2008) ............................. 4, 10, 12

17

*First State Orthopaedics v. Concentra, Inc.*,
   534 F. Supp. 2d 500 (E.D. Pa. 2007) .......................................................................... 6

18

*Garner v. State Farm Mut. Auto. Ins. Co.*,
   No. 08-1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ....................................... 9

19

*Gribble v. Cool Transps. Inc.*,
   No. 06-4863, 2008 WL 5281665 (C.D. Cal. Dec. 15, 2008) ....................................... 8

20

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................................. 1, 8

21

*Hesse v. Sprint*,
   598 F.3d 518 (9th Cir. 2010) ...................................................................................... 8

22

*Huguley v. Gen. Motors Corp.*,
   999 F.2d 142 (6th Cir. 1983) .................................................................................... 11

23

*In re Am. Family Enters.*,
   256 B.R. 377 (D.N.J. 2000) ...................................................................................... 10

24

25

26

27

28

**Table of Authorities**
**(Continued)**

Page(s)

*In re Apple Deriv. Litig.*,
  No. 06-4128, 2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008).................................. 12

*In re Inkjet Printer Litig.*,
  No. 05-3580, 2008 U.S. Dist. LEXIS 56979 (N.D. Cal. July 28, 2008).....................................4

*In re IPO Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ....................................................................... 10

*In re Lifelock, Inc. Mktg. & Sales Practices Litig.*,
  MDL No. 08-1977, 2010 WL 3715138 (D. Ariz. Aug. 31, 2010) .........................................7

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...................................................................9

*In re Prudential Ins. Co. Am. Sales Practice*,
  148 F.3d 283 (3rd Cir. 1998) ............................................................................ 12

*Myers v. MedQuist, Inc.*,
  No. 05-4608, 2009 WL 900787 (D.N.J. Mar. 31, 2009)...................................................7

*Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ......................................................................2, 13

*Oestreicher v. Alienware Corp.*,
  544 F. Supp. 2d 964 (N.D. Cal. 2008), *aff'd*, 322 Fed. Appx. 489 (9th Cir. 2009).....................5

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982)............................................................................2, 3

*Perez v. Asurion Corp.*,
  501 F. Supp. 2d 1360 (S.D. Fla. 2007) ................................................................. 10

*Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968).......................................................................................3

*Reed v. Gen. Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) ........................................................................... 11

*Reyn's Pasta Bella, LLC v. VISA USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) ..............................................................................8

*Smith v. Grayling Corp.*,
  No. 07-1905, 2008 WL 3861286 (E.D. Pa. Aug. 20, 2008) .............................................7

*Stoetzner v. U.S. Steel Corp.*,
  897 F.2d 115 (3rd Cir.1990) ........................................................................... 11

*Taifa v. Bayh*,
  846 F. Supp. 723 (N.D. Ind. 1994) ................................................................... 11

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993)...............................................................................1

*Yeagley v. Wells Fargo & Co.*,
  No. 05-3403, 2008 U.S. Dist. LEXIS 5040 (N.D. Cal. Jan. 18, 2008) ..........................3, 6, 10

*Yong Soon Oh v. AT&T Corp.*,
  225 F.R.D. 142 (D.N.J. 2004) ........................................................................5, 6

# I.  INTRODUCTION

After careful scrutiny to ensure that the proposed class settlement was fair, reasonable, and adequate, this Court granted preliminary approval on October 1, 2010.  There are no new facts or issues that change this conclusion in any respect.  The settlement remains fair, reasonable, and adequate, particularly when balanced against the significant hurdles facing Plaintiffs and the class if they pursue litigation.  Further, the extraordinarily low number of objections, complaints, and opt-outs relative to the number of class members is compelling evidence that the settlement enjoys overwhelming support from the class:  Out of a notice that reached tens of millions of potential class members, there were only three objections, 458 non-filed complaints, and 810 timely opt-outs. It is worth noting that several of the non-filed complaints suggest that the claims pursued in this litigation are meritless, and they express frustration that Defendant Hewlett-Packard Company ("HP") had to defend itself against these claims.  The objectors ignore these facts, and raise mostly boilerplate objections and unsubstantiated accusations of "collusion" despite compelling record evidence to the contrary—including a declaration from a very well-respected mediator, the Hon. James L. Warren of JAMS, which establishes that the settlement was the result of several years of arm's-length negotiations through several mediation sessions.

For these and the other reasons discussed below and in Plaintiffs' brief, HP respectfully requests that the Court enter the Order Granting Final Approval and Final Judgment.

# II.  ARGUMENT

Courts in the Ninth Circuit consider the following factors in assessing whether a settlement agreement is fair, reasonable, and adequate:  (a) the strength of plaintiff's case; (b) the risk, expense, complexity, and likely duration of further litigation; (c) the risk of maintaining class action status throughout the trial; (d) the amount offered in settlement; (e) the extent of discovery completed, and the stage of the proceedings; (f) the experience and views of counsel; (g) the presence of a governmental participant; and (h) the reaction of the class members to the proposed settlement.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).  "Not all of these factors will apply to every class action settlement."  *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523,

1    529 (C.D. Cal. 2004).  "The relative degree of importance to be attached to any particular factor

2    will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief

3    sought, and the unique facts and circumstances presented by each individual case."  *Officers for*

4    *Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

5            Plaintiffs' brief explains how all of these factors support final approval, but in the discussion

6    below, HP addresses the following:  (1) the weaknesses of Plaintiffs' case and the risk of further

7    litigation; (2) the settlement benefits; and (3) class members' reactions to the settlement.  HP also

8    responds to the objectors' unsubstantiated assertion that the settlement was the product of collusion.

9    In fact, the settlement is entitled to a presumption of fairness because it followed extensive

10   discovery, and the parties conducted arm's length negotiations in good faith.

11   **A.      The Proposed Settlement Is Very Favorable To The Class Given The Considerable**

12           **Risk Involved With Continued Litigation**

13           The objectors fail to acknowledge or even confront the substantial weaknesses of Plaintiffs'

14   claims.  However, "[b]asic to analyzing a proposed settlement in every instance, of course, is the

15   need to compare the terms of the compromise with the likely rewards of litigation."  *Yeagley v.*

16   *Wells Fargo & Co.*, No. 05-3403, 2008 U.S. Dist. LEXIS 5040, at *11 (N.D. Cal. Jan. 18, 2008)

17   (internal parenthetical omitted; quoting *Protective Comm. For Indep. Stockholders of TMT Trailer*

18   *Ferry*, *Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)); *see also Browning v. Yahoo! Inc.*, No. 04-

19   1463, 2007 U.S. Dist. LEXIS 86266, at *15 (N.D. Cal. Nov. 16, 2007) (approving settlement and

20   noting that "perhaps most importantly, [the] objections do not sufficiently consider … the

21   considerable risks involved with continued litigation").

22           Courts routinely approve as fair and reasonable those settlements that offer even minimal

23   benefits in exchange for the release of relatively weak claims.  *See*, *e.g.*, *Officers for Justice*, 688

24   F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the

25   potential recovery will not per se render the settlement inadequate or unfair. … It is the complete

26   package taken as a whole, rather than the individual component parts, that must be examined for

27   overall fairness."); *Yeagley*, 2008 U.S. Dist. LEXIS 5040, at *13-14.  Class counsel have

28   acknowledged the tenuous nature of their clients' claims and that further litigation to establish

liability poses a significant risk to any recovery for the class.  (Pls.' Mot. Prelim. Approval, Nov. 29, 2010 [Dkt #261], at 4-10; Pls.' Mot. Final Approval.)  In each of the three cases, HP has presented strong challenges to the viability of Plaintiffs' claims:[1]

1.  *Ciolino*.  Even though this case has been pending for over five years, Plaintiffs cannot demonstrate any injury in fact to the class (let alone an injury traceable back to HP), or any individual damages.  (Def.'s Opp. to Mot. Certif. of Cal. Class, Sept. 28, 2010 [Dkt #218], at 19.) In fact, this Court has already characterized Plaintiffs' evidence of cognizable injury and causation as "weak."  *See In re Inkjet Printer Litig.*, No. 05-3580, 2008 U.S. Dist. LEXIS 56979, at *6, 9 (N.D. Cal. July 28, 2008).  The objectors ignore these weaknesses in Plaintiffs' case, and fail to recognize that, in essence, Plaintiffs' claim amounts to an assertion that HP's low-on-ink messages could have been better.  The objectors also ignore this Court's denial of a nationwide litigation class in *Ciolino* on manageability grounds.  *Id*.  *See*, *e.g.*, *Browning*, 2007 U.S. Dist. LEXIS 86266, at *25 (overruling objections that painted an unreasonably rosy picture of the potential success of the claims by ignoring the substantial hurdles to class certification for trial purposes given the failure to obtain certification in a related case).  In doing so, they fail to recognize that given the Court's denial of a nationwide class, but for this settlement, the nationwide settlement class would receive nothing at all.

2.  *Rich*.  Plaintiffs' core claim is that HP misled and deceived customers by failing to disclose its use, under certain circumstances, of a combination of inks, black and other colors, to produce high quality black text and images (the parties have referred to this process generally as "underprinting").  There are several significant faults with this claim, which HP is testing in a pending motion for summary judgment.  *See*, *e.g.*, *Fernandez v. Victoria Secret Stores*, No. 06-4149, 2008 WL 8150856, at *5 (C.D. Cal. July 21, 2008) ("The Ninth Circuit has suggested that the pendency of a motion for summary judgment indicates that the strength of plaintiffs' case has not

---

[1] HP denies all of Plaintiffs' claims in the *Ciolino*, *Rich*, and *Blennis* actions and vigorously disputes that it has engaged in any actionable conduct, and it has agreed to resolve the cases to avoid the uncertainties, delays, and other risks inherent in continued litigation.  HP reserves all of its objections to class certification for litigation purposes, and it has consented to certification for settlement purposes only.

3

1    yet been tested and that it favors a finding that the settlement is fair as a result.") (citing *Churchill*

2    *Vill.*, *L.L.C. v. Gen. Elec. Co.*, 361 F.3d 566, 576 (9th Cir. 2004)).

3         For example, Plaintiffs do not contend that HP made *any* false or misleading statements to

4    them about these processes, even though binding Ninth Circuit authority requires Plaintiffs to show

5    that HP had an affirmative duty to disclose the allegedly concealed information.  *See, e.g.*,

6    *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 974 (N.D. Cal. 2008), *aff'd*, 322 Fed. Appx.

7    489, 493 (9th Cir. 2009) ("A manufacturer's duty to consumers is limited to its warranty obligations

8    absent either an affirmative misrepresentation or a safety issue.").  Plaintiffs also fail to plead or

9    prove that HP promised its customers one thing and delivered something else.  In another lawsuit

10   brought by many of the same lawyers representing Plaintiffs here, the District Court granted

11   summary judgment to HP on a UCL claim based on precisely the same lack of injury here.  *Baggett*

12   *v. HP*, No. 07-0667, 2009 U.S. Dist. LEXIS 95241 (C.D. Cal. Sept. 29, 2009).

13        In addition, Plaintiffs will face substantial difficulty in showing that the alleged failure to

14   disclose underprinting was *material* to customers' purchase decisions.  *Clemens v. DaimlerChrysler*

15   *Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) (plaintiffs' UCL fraud claim fails because there is no

16   support for a finding that the alleged omission was material to the customer's purchasing decision).

17        There are also substantial hurdles to obtaining class certification.  It would be impossible to

18   determine injury and damage on a class basis because, among other things, underprinting is used

19   only in limited circumstances depending on various factors, including several user-determined

20   factors, with many print jobs not triggering underprinting at all.  (*Rich v. HP*, Case No. 06-03361,

21   Def.'s Mot. Summ. J., Dec. 7, 2009 [Dkt #86], at 6-7.)  *See also Yong Soon Oh v. AT&T Corp.*, 225

22   F.R.D. 142, 150 (D.N.J. 2004) (the extensive evidence plaintiffs would have to present to

23   demonstrate the subjective intent and actual damages of each class member weighs in favor of

24   settlement).  Many customers appreciate the improvements in print quality achieved through

25   underprinting, and others use one of many options available to disable this process.  (*Rich v. HP*,

26   Case No. 06-03361, Opp. to Mot. Certif. of Class, Dec. 7, 2009 [Dkt #90], at 5-6, 16.)

27        3.  *Blennis*.  Many of the foregoing arguments also apply in *Blennis*, where there is no

28   evidence of any actual harm to consumers, and determining whether and which class members may

4

1   have hit an expiration date without realizing that their inkjet printer employed such technology

2   would be virtually impossible.  As in *Ciolino* and *Rich*, Plaintiffs also do not adequately plead a

3   specific HP statement that violates the UCL.  (*Blennis v. HP*, Case No. 07-00333, Def.'s Mot.

4   Dismiss, July 13, 2007 [Dkt #12], at 3.)

5          These are precisely the types of considerations regarding the weakness of plaintiffs' case

6   that courts weigh in favor of settlement.  The objectors, however, have either misread the settlement

7   papers or have chosen to ignore these weaknesses inherent in Plaintiffs' claims.

8          Were courts to begin adopting objections such as those submitted here (which insist on

9   relief that does not properly weigh the value of the underlying claims), it would become difficult—

10  if not impossible—for defendants to settle weak claims.  But the Ninth Circuit has a "strong judicial

11  policy that favors settlements, particularly where complex class action litigation is concerned."

12  *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  And class members in litigations

13  with prospects "so bleak as to render [the limited settlement benefits] good value for a relatively

14  weak case," would be denied "good value" in the form of those limited benefits.  *Yeagley*, 2008

15  U.S. Dist. LEXIS 5040, at *13-14.

16  **B.    The Settlement Benefits Provide Real Value To The Class—Particularly In Light Of**

17  **       The Substantial Hurdles To Continued Litigation**

18         1.  <u>Injunctive Relief</u>.  Where plaintiffs' claims are questionable, as they are here, federal

19  courts consistently approve class settlements providing only non-monetary relief to class members

20  in exchange for a broad release.[2]  The extensive disclosures provided through the injunctive relief

21  _____

22  [2]  *Bolger v. Bell Atl. Corp.*, 2 F.3d 1304, 1311 (3rd Cir. 1993) (approving settlement providing no
    pecuniary relief where the probability of plaintiffs' success on the merits was uncertain); *Chin v.*

23  *RCN Corp.*, No. 08-7349, 2010 WL 3958794, at *4 (S.D.N.Y. Sept. 8, 2010) (rejecting
    objections that "suggest that injunctive relief—or at least injunctive relief that is temporary—is

24  inadequate, and that only damages will suffice," because the defendant had strong arguments
    that its actions did not violate federal or state law and that "the possibility that Plaintiffs could

25  do slightly better if the case were to proceed further needs to be counterbalanced against the real
    possibility that—in addition to running up significantly more costs, potentially over the course

26  of several more years—the Plaintiffs could ultimately do much worse."); *Yong Soon Oh*, 225

27  F.R.D. at 150 (approving settlement that provided only injunctive relief in exchange for a broad
    release of damages due to the weakness of plaintiffs' case); *First State Orthopaedics v.*

28  *Concentra, Inc.*, 534 F. Supp. 2d 500, 521-22 (E.D. Pa. 2007) (explaining that "the absence of
    [Footnote continued on next page]

in the settlement directly address the core claims in *Ciolino*, *Rich*, and *Blennis*.  These benefits will

reach tens of millions of customers.  Balancing these benefits against the substantial uncertainties,

risks, and problems surrounding Plaintiffs' claims, and the strong possibility that Plaintiffs and the

class may recover nothing if they proceed with the litigation, weighs heavily in favor of approving

this settlement.  *See Chin*, 2010 WL 3958794, at *3-5.

      2.  E-Credits.  Based on the foregoing, the settlement would be fair, reasonable, and

adequate even if it included only the aforementioned injunctive relief.  But certainly the inclusion of

the e-credits cannot undermine the settlement.  These e-credits provide real value because they can

be used to buy any number of different products available at the HP website.[3]  *See Browning*, 2007

U.S. Dist. LEXIS 86266, at *11 ("Because the settlement class consists of consumers who

previously purchased similar products [], class members are likely to be interested in such relief.");

*Smith v. Grayling Corp.*, No. 07-1905, 2008 WL 3861286, at *1 (E.D. Pa. Aug. 20, 2008)

(approving settlement of class action providing $7.00 vouchers to restaurant that allegedly

improperly printed receipts containing the last five digits of a person's credit card)   The settlement

provides this monetary relief to class members who can establish that they purchased one of the

products at issue (through a variety of means), and provides additional monetary relief to class

members who can *attest* to injury or damage, without having to *prove* any damage.

      The objections and complaints essentially argue that these benefits could have been "better,"

but this is not a valid basis for rejecting a settlement.  As the Ninth Circuit has explained:

---

[Footnote continued from previous page]
   monetary relief does not automatically render a settlement unfair," and approving settlement
   providing only injunctive relief in exchange for the release of money damages where the merits
   of plaintiffs' case were weak); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, MDL No. 08-
   1977, 2010 WL 3715138, at *3 (D. Ariz. Aug. 31, 2010) ("Many courts have approved
   settlements where, as here, the consideration offered consists of injunctive relief."); *Myers v.
   MedQuist, Inc.*, No. 05-4608, 2009 WL 900787, at *15 (D.N.J. Mar. 31, 2009) ("The question is
   whether the proposed settlement provides a good value for Plaintiffs' weak claims,
   notwithstanding the absence of direct monetary payments to individual class members.").

[3]  The e-credits will be redeemable for any "printers and printer supplies," without limit, offered
   on HP's website.  (McCarthy Decl. Supp. Mot. Prelim. Approval, Ex. B (Stip. Settlement),
   Aug. 26, 2010 [Dkt #253-2], at 16.)  Thus, the objection that HP "will not reveal until some
   future point exactly what products are eligible for e-credit redemption" is without merit.  (*See*
   Frank & Schratwieser, Dec. 30, 2010 [Dkt #263] at 6.)

> Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean the settlement presented was not fair, reasonable or adequate. Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.

*Hanlon*, 150 F.3d at 1026-27; *see also Browning*, 2007 U.S. Dist. LEXIS, at *17 (noting that objectors' complaints that the settlement did not provide a full cash refund "is tantamount to complaining that the settlement should be 'better,' which is not a valid objection"); *Alliance to End Repression v. City of Chi.*, 91 F.R.D. 182, 195 (N.D. Ill. 1981) ("By definition, a fair settlement need not satisfy every concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits.").

Of course, customers who believe they would be forfeiting valuable claims are free to opt out of the class and attempt to bring a damages suit. The overwhelming majority of putative class members have not done so. *See*, *e.g.*, *Gribble v. Cool Transps. Inc.*, No. 06-4863, 2008 WL 5281665, at *9 (C.D. Cal. Dec. 15, 2008) (noting "it is important to remember that the [settlement agreement] is a better option than not receiving any compensation, which is a reasonable possibility given the questions surrounding Plaintiff's claims and class certification").

3. <u>Release</u>. One objection baldly states, with no support or analysis, that the release is "far broader then the claims brought in this lawsuit." (*See* Frank & Schratwieser, Dec. 30, 2010 [Dkt #263], at 12.) Even a cursory review of the record proves otherwise. The parties carefully tied the release to the specific claims in the three lawsuits, as defined by the pleadings and the specific theories elaborated in the extensive briefing by Plaintiffs' counsel.[4] This is abundantly clear from Appendix A, which contains: (1) in one column, an analysis of Plaintiffs' allegations in *Ciolino*,

---

[4] *See also Reyn's Pasta Bella, LLC v. VISA USA, Inc.*, 442 F.3d 741, 748-49 (9th Cir. 2006) ("The weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as the underlying claims in the settled class action….'"); *Class Plaintiffs*, 955 F.2d at 1287 (permitting a release of claims that "arise from the same common nucleus of operative fact" as those in the case pending before it). The parties also tailored the terms of release to meet the "identical factual predicate" language in *Hesse v. Sprint*, 598 F.3d 518 (9th Cir. 2010), even though that case involved distinguishable facts. But here, unlike in *Hesse*, the Stipulation of Settlement describes in detail the predicate facts that were raised and litigated in *Ciolino*, *Rich*, and *Blennis*, and the released claims share an "identical factual predicate" with the litigated claims.

7

1   *Rich*, and *Blennis*; and (2) in the other column, the specific terms of the release in the Stipulation of

2   Settlement that relate to those allegations.

3        It is not even clear that the objectors reviewed the pleadings in all three cases covered by

4   this settlement.  For example, the objectors' references to "the complaint" and "the docket" (*id.* at 9,

5   13, 20) suggest that they have not reviewed the filings in all three cases, which would explain the

6   baseless objection that the release is broader than the claims brought in "this lawsuit."  (*Id.*)  The

7   objection appears to focus on *Ciolino* and does not discuss the substance of the allegations in *Rich*

8   or *Blennis*.

9   **C.      The Proposed Settlement Enjoys Overwhelming Support From The Settlement Class**

10        This "Court 'may appropriately infer that a class settlement is fair, adequate, and reasonable

11   when few class members object to it.'"  *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-1365,

12   2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (quoting *Create-A-Card*, *Inc. v. Intuit, Inc.*,

13   No. 07-6452, 2009 WL 3073920, at *15 (N.D. Cal. Sept. 22, 2009)).  "It is established that the

14   absence of a large number of objections to a proposed class action settlement raises a strong

15   presumption that the terms of a proposed class settlement action are favorable to the class

16   members."  *In re Omnivision Techs.*, *Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008); *Dupler v.*

17   *Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 239 (E.D.N.Y. 2010) ("[A] small number of class

18   members seeking exclusion or objecting indicates an overwhelming positive reaction of the class.").

19        Here, the class members have had an overwhelmingly positive reaction to the settlement.

20   The total number of units shipped during the class period is more than 100 million.  (Decl. of

21   Cameron R. Azari, Aug. 26, 2010, ¶ 5.)  Direct email notice was provided to 13,387,489 class

22   members, with a delivery rate of approximately 89%.  (Decl. of Cameron R. Azari, Jan. 14, 2011,

23   ¶ 10.)  In addition, notices were published in USA WEEKEND, PARADE, PEOPLE, and CIO

24   MAGAZINE, and in banner advertisements on Yahoo.com and other websites through 24/7 Real

25   Media Network, and reached an estimated 74% of the class.  (Decl. of Cameron R. Azari, Aug. 26,

26   2010, ¶¶ 5-6, 10, 13-16, 18-19, 24; Decl. of Cameron R. Azari, Jan. 14, 2011, ¶¶ 12-18.)  Despite

27   the success of the notice program in reaching class members and apprising them of the settlement,

28   very few individuals have expressed displeasure with the settlement:

8

| | |
|---|---|
| Filed Objections[5] | 3 |
| Non-filed comments/complaints | 458 |
| Opt-outs | 810 |

The small number of objections and complaints in this case is further mitigated by the fact that one of the objectors and eight of those who submitted non-filed comments and complaints also submitted claim forms.[6] (Decl. of Cameron R. Azari, Jan. 14, 2011, ¶ 24.) *See Fernandez*, 2008 WL 8150856, at *8 (finding that the small number of objections is further mitigated because two of the objectors filed claim forms).

Clearly, the portion of the class taking issue with the settlement (whether by objection, comment/complaint, or opt-out) is miniscule by any measure—whether relative to the size of the class (less than *four-thousandth* of 1%, conservatively assuming 40 million class members), or the number of notices sent (less than *one-hundredth* of 1%). *See Yeagley*, 2008 U.S. Dist. LEXIS 5040, at *5 (approving settlement where significantly less than 1% of the 3.8 million members filed claim forms but significantly fewer objected); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (finding that 100 objections out of 10.3 million class members weighs in favor of approval, especially given the "large number of claims" numbering 220,000); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250, 266 (E.D.N.Y. 2009) (granting final approval to settlement where notice was sent to over 2.2 million class members, and there were 3,145 claims filed, 65 opt-outs, and 5 objections); *In re IPO Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (granting final approval of settlement involving seven million potential class members, and 100,000 claims, 371 opt-outs, and 140 objections); *In re Am. Family Enters.*, 256 B.R. 377 (D.N.J. 2000) (granting final approval of

---

[5] The October 1, 2010, preliminary approval order instructed that objections must be filed with the Court by January 3, 2011. (Prelim. Approval Order, Oct. 1, 2010 [Dkt #259], ¶ 13; *see also id.* ¶ 16(d).) In addition, the notices provided the same instruction. (*See* Decl. of Cameron R. Azari, Jan. 14, 2011, ¶¶ 10, 14, Attachments 2, 4.) As the docket reflects, only three objections complied with this order. (*See* Frank & Schratwieser Obj., Dec. 30, 2010 [Dkt #263]; Colburn Obj., Jan. 3, 2011 [Dkt #265]; Cannata Obj., Jan. 3, 2011 [Dkt #266].) No other objection is properly before the Court and accordingly, should not be considered.

[6] As of the date of this filing, Settlement Class Members have another month to submit claims. The parties will report preliminary claims numbers at the final approval hearing in this matter.

settlement where the class size was in the tens of millions, and there were 143,000 claims filed, and 150 objections).  Courts have repeatedly approved settlements with objection rates as high as 10% or more, often finding such rates as strongly favoring settlement and persuasive evidence that the settlement is fair and adequate.[7]

The objection and opt-out numbers here are astoundingly low, especially considering that class members were allowed to submit opt-outs and complaints via e-mail.  (Prelim. Approval Order, Oct. 1, 2010 [Dkt  #259], ¶¶ 12-13, 16(c)-(d).)  Therefore, expressing discontent with the settlement was as simple as replying to the e-mail notice, and many of the non-filed complaints were nothing more than a few hastily typed lines expressing generalized displeasure with class action lawsuits.

In fact, many of the non-filed "complaints" actually take issue with the underlying merits of Plaintiffs' claims, and not with the settlement benefits.  The sample communications excerpted below contend that the claims pursued in this litigation are meritless and should be dismissed:

- "I just received notice of this class action lawsuit against HP.  Are these people nuts?  They didn't understand a Low Ink warning is just that, a warning?  Please convey my condolences to HP for this frivolous lawsuit, and consider me a 'conscientious objector'.  Any claims I may have received from this lawsuit are knowingly and willfully forfeit."

- "'Yes' I personally have one of HP's 'affected' printers and I will not be suing anyone.  The fact is that it is a good printer, I like the fact that it gives a reading on the ink levels, and any purchaser with a drop of common sense in their heads will know that the reading is an 'indication' of how much ink is left and does not mean that one should immediately purchase and replace the cartridge.  I suppose if HP did not have the ink indication feature, someone would also find an attorney who would happily argue the case that '*my client was irreparably damaged when his printer ran out of ink.*'"

---

[7] *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (objections from only 16% of the class was "persuasive" that the settlement was adequate); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3rd Cir.1990) (objections from a little over 10% of the class "strongly favors settlement"); *Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (same); *Huguley v. Gen. Motors Corp.*, 999 F.2d 142, 145 (6th Cir. 1983) (court observed that it had previously approved a settlement over objections of 15% of the class); *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 174-75 (5th Cir. 1983) (affirming district court's approval of settlement despite "the objections of twenty-three of twenty-seven named plaintiffs and nearly 40% of the 1,517 member class.").

- "I found the low ink messages to be a nice reminder that I needed to purchase ink. I do not think they made me change the cartridge early or buy more ink… I'm not filing a claim for any of this."

- "HP did nothing wrong and was just trying to help the consumer manage his or her office with these messages.  If the users of the printers relied on the messages that popped up to determine when to replace the printer cartridges then shame on them.  I believe that any reasonably informed consumer would know that the information is only a recommendation and not a firm must do."

- "How utterly silly.  If a user does not know that color is used to print a black image then they have NEVER used an HP printer to its fullest nor have they done sufficient research into printer and/or ink cartridge technology. Besides, the printer software gives the user the option of using only the black cartridge!!!!  The page yield specifications are just that, specifications.  Those were NEVER published to be used as numbers cast in stone.  A printer manufacturer can NEVER give actual page yields; page yield is TOTALLY a function of what is being printed!!"

- "I object to the assertion that HP is responsible for damages for not providing an option to disable the colored ink use in black and white copies … Besides, the setup menu, on my printers anyway, does give the option to print in black only."

These comments are relevant to the Court's consideration of the fairness of the class through settlement.  *See*, *e.g.*, *In re Prudential Ins. Co. Am. Sales Practice*, 148 F.3d 283, 318 n.62 (3rd Cir. 1998) (affirming approval of settlement, noting that many of those who opted out wrote "to indicate that they do not feel they were mislead in the purchase of their insurance, are satisfied with their policies, and do not want to participate in the action against Prudential").

**D.   The Settlement Is Entitled To A Presumption Of Fairness Because It Was Negotiated In Good Faith And At Arm's Length**

The objectors assert—without any factual support—that the settlement was a product of collusion.  (*See* Frank & Schratwieser, Dec. 30, 2010 [Dkt #263], at 13, 14; Colburn Obj., Jan. 3, 2011 [Dkt #265], at 11, 14; *cf.* Cannata Obj., Jan. 3, 2011 [Dkt #266], at 4.)  To the contrary, over the course of several years, the parties engaged in substantial discovery, retained several experts, conducted an extensive investigation into the claims at issue, litigated numerous pretrial motions, and ultimately reached a hard-fought, arm's length settlement through the assistance of several well respected mediators.  In addition, as the parties have testified, they negotiated the benefits to the class *before* discussing Plaintiffs' claim to attorneys' fees.  (*See* Decl. of Samuel G. Liversidge Decl. ¶ 5.)  *See also Fernandez*, 2008 WL 8150856, at *4 (the settlement was entitled to a

11

1    presumption of fairness because the parties had engaged in extensive discovery and motions

2    practice, and reached settlement with the help of an able and neutral mediator); *In re Apple Deriv.*

3    *Litig.*, No. 06-4128, 2008 U.S. Dist. LEXIS 108195, at *11-12 (N.D. Cal. Nov. 5, 2008) (parties'

4    negotiations free of collusion because, among other things, the parties negotiated the benefits to the

5    class before discussing attorneys' fees). The parties' mediator—Judge James L. Warren—has

6    submitted a declaration explaining that the settlement was negotiated by the parties at arm's length

7    and in good faith. (Decl. of James L. Warren, Jan. 13, 2011, ¶ 5.) *See In re Apple Deriv. Litig.*,

8    2008 U.S. Dist. LEXIS 108195, at *11-12 (crediting declaration submitted by the parties' mediator

9    in concluding that the settlement negotiations were free of collusion).

10       This settlement is presumptively fair because it was the result of good faith, arm's length

11   negotiations between the parties, and the objectors have offered no argument (and produced no

12   evidence) to rebut this presumption. *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("A settlement

13   following sufficient discovery and genuine arms-length negotiation is presumed fair.").

14                            **III.  <u>CONCLUSION</u>**

15       Given the substantial benefits conferred on the class by the settlement, particularly in light

16   of the substantial questions surrounding Plaintiffs' claims, the low number of objections and opt-

17   outs, and the presumption of fairness accorded by the process by which the parties achieved it, HP

18   respectfully requests that the Court approve the settlement as fair, reasonable, and adequate.

19

20   Dated: January 14, 2011                 GIBSON, DUNN & CRUTCHER LLP

21

22                        _____/s/ Samuel G. Liversidge*_____
                          Samuel G. Liversidge

23                        Attorneys for Defendant Hewlett-Packard Company

24                        *I hereby attest that I have on file all holograph
                          signatures for any signatures indicated by a
25                        "conformed" signature (/s/) within this efiled
                          document.

26

27

28

---

DEFENDANT'S STATEMENT IN SUPPORT OF                    Master File No. C05-3580 JF
FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1

### Appendix A

2

**Comparison of Plaintiffs' Allegations In The Inkjet Cases And
The Terms Of The Release In The Stipulation of Settlement**

3

4

| PLAINTIFFS' ALLEGATIONS | RELEASE LANGUAGE* |
|---|---|
| **"Quantity of Output"**<br>_Ciolino_: "[T]he 'smart chip' technology is designed and programmed to send a premature and false message to consumers advising them that they will need to purchase a replacement cartridge of ink, when in fact, the printer cartridge is far from empty and is capable of printing hundreds of additional pages." (_Ciolino_ Second Consol. Am. Compl. ¶ 2.) *Also see specific allegations copied below.*<br><br>**"Amount of Usable Ink"**<br>_Blennis_: "HP has designed its inkjet printers and ink cartridges that are used with those printers to shut down on an undisclosed 'expiration date …. [Consumers are] thereby prevent[ed] [from] using the significant amount of useable ink remaining in an 'expired' ink cartridge." (_Blennis_ Compl. ¶ 17.) *Also see specific allegations copied below.*<br><br>**"Value Received"**<br>_Ciolino_: "As a result of the low-ink messages, … plaintiffs did not obtain the full value of the HP cartridges they purchased." (_Ciolino_ Opp. to Mot. Dismiss Second Consol. Am. Compl., May 12, 2006, at 2 [Dkt #41].) *Also see specific allegations copied below.* | Claims "that relate in any way to the **quantity of output**, **amount of usable ink** or **value received** from the Affected Models and their corresponding inkjet cartridges," including, but not limited to, all claims that relate in any way to the specific terms quoted below in this column. |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

---

21

\* The Stipulation of Settlement defines "Released Claims" as claims that "were brought or that could have been brought against the Released Parties …, or any of them, and that arise out of or are related in any way to any or all of the acts, omissions, facts, matters, transactions, or occurrences that were or could have been directly or indirectly alleged or referred to in the Action," including, but not limited to, the specific terms quoted in the column "Release Language" of this chart. (Stipulation of Settlement, Aug. 26, 2010, ¶ 21.)

22

23

24

The Stipulation of Settlement defines "Claims" to include "any and all claims, demands, rights, damages, obligations, suits, debts, liens, and causes of action of every nature and description whatsoever, ascertained or unascertained, suspected or unsuspected, existing or claimed to exist, including unknown claims (as described in Paragraph 52 of the Stipulation of Settlement) as of the Effective Date by all of the Plaintiffs and all Settlement Class Members (and Plaintiffs' and Settlement Class Members' respective heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors-in-interest, and assigns) …." (_Id._ ¶ 21(a).)

25

26

27

28

| PLAINTIFFS' ALLEGATIONS | RELEASE LANGUAGE* |
|---|---|
| *Ciolino*: "HP has designed and programmed the smart chip to falsely advise consumers that their printer cartridge requires replacement, when in fact, the cartridge is far from empty. The smart chip also prevents the use of a printer cartridge after a predetermined date, even if the cartridge is full or nearly full." (*Ciolino* Opp. to Mot. Dismiss First Consol. Am. Compl., Feb. 3, 2006, at 1-2 [Dkt #28] (citations omitted); *see also id.* at 1-2, 4-6; *Ciolino* Second Consol. Am. Compl. ¶¶ 2, 22-24, 27, 29, 41, 50, 63, 69; *Ciolino* Mot. Certif. Nationwide Class, July 20, 2007, at 3-4, 6-14 [Dkt #60]; *Ciolino* Mot. Certif. Cal. Class, Mar. 26, 2009, at 1-3, 4-13 [Dkt #185].) <br><br> *Blennis*: "HP has designed its inkjet printers and ink cartridges that are used with those printers to shut down on an undisclosed 'expiration date.' Not only are consumers prevented from using the significant amount of ink that remains in the purportedly 'expired' cartridge, **ALL** printing operations … are prevented until the purportedly 'expired' cartridge is replaced." (*Blennis* Compl. ¶ 2; *see also id.* ¶¶ 3, 17, 46, 53, 64-65, 75, 83, 88; *Blennis* Opp. to Mot. Dismiss, July 27, 2007, at 1-3, 17-18, 20 [Dkt #17]; *Blennis* Mot. Certif. Class, Dec. 8, 2009, at 1-3, 7, 8-9 [Dkt #47].) | Claims that relate to "(A) the end-of-life or out-of-ink behavior or messages of the Affected Models and their corresponding inkjet cartridges" |
| *Ciolino*: "HP developed a 'smart chip' that HP embedded into its printer cartridges …. According to HP, the 'smart chip' stores information about the type and status of the supply of ink in the cartridge." (*Ciolino* Second Consol. Am. Compl. ¶ 22; *see also id.* ¶¶ 2, 23-24, 27, 28-29, 50, 63; *Ciolino* Opp. to Mot. Dismiss First Consol. Am. Compl., Feb. 3, 2006, at 1-2 [Dkt #28]; *Ciolino* Opp. to Mot. Dismiss Second Consol. Am. Compl., May 12, 2006, at 1-2, 4-6 [Dkt #41]; *Ciolino* Mot. Certif. Nationwide Class, July 20, 2007, at 3-4, 6-14 [Dkt #60]; *Ciolino* Mot. Certif. Cal. Class, Mar. 26, 2009, at 1-3, 4-13 [Dkt #185].) | Claims that relate to "(B) HP's use of smart chips or other devices that electronically store data in connection with the Affected Models and their corresponding inkjet cartridges" |

| PLAINTIFFS' ALLEGATIONS | RELEASE LANGUAGE* |
|---|---|
| _Ciolino_:  "Plaintiffs received multiple low-ink messages in connection with the use of their HP printers.  As a result of the low-ink messages, plaintiffs were misled into believing their printer cartridges were empty or nearly empty …."  (_Ciolino_ Opp. to Mot. Dismiss Second Consol. Am. Compl., May 12, 2006, at 2 [Dkt #41] (citations omitted); _see also id._ at 1-2, 4-6; _Ciolino_ Second Consol. Am. Compl. ¶¶ 2, 22-23, 27, 29, 50, 63, 69; _Ciolino_ Mot. Certif. Nationwide Class, July 20, 2007, at 3-4, 6-14 [Dkt #60]; _Ciolino_ Mot. Certif. Cal. Class, Mar. 26, 2009, at 1-3, 4-13 [Dkt #185].) | Claims that relate to "(C)  HP's use of LOI (low-on-ink) Messages or any other representations concerning the status of the ink remaining in an inkjet cartridge, including the amount of ink or number or pages remaining, in connection with the Affected Models and their corresponding inkjet cartridges" |
| _Blennis_:  "HP has designed its inkjet printers and ink cartridges that are used with those printers to shut down on an undisclosed 'expiration date.'"  (_Blennis_ Compl. ¶ 17; _see also id._ ¶¶ 2, 3, 46, 53, 64-65, 75, 83, 88; _Blennis_ Opp. to Mot. Dismiss, July 27, 2007, at 1-3, 17-18, 20 [Dkt #17]; _Blennis_ Mot. Certif. Class, Dec. 8, 2009, at 1-3, 7, 8-9 [Dkt #47].) | Claims that relate to "(D)  HP's use of Ink Expiration dates in connection with the Affected Models and their corresponding inkjet cartridges" |
| _Rich_:  "Unbeknownst to consumers, [HP] has designed its color inkjet printers to deplete a large amount of color ink when consumers print certain black text and images.  As a result of this 'underprinting' technology, and given the exorbitant cost of ink, consumers unwittingly incur substantial additional costs when they print such black and white images and text."  (_Rich_ Mot. Certif. Class, June 23, 2009, at 3 [Dkt #62]; _see also id._ at 4-10; _Rich_ Second Am. Compl. ¶¶ 1, 16-18, 20, 28-29, 47, 50, 63, 64; _Rich_ Opp. to Mot. Dismiss First Am. Compl., Nov. 10, 2006, at 1-3, 6, 10-11, 15-16, 18-20 [Dkt #28].) | Claims that relate to "(E)  HP's use of Underprinting in connection with the Affected Models and their corresponding inkjet cartridges"<br><br>[The Stipulation of Settlement defines "Underprinting" as "the process whereby certain HP color inkjet printers may, in certain circumstances depending on the printer settings and customer inputs, use a combination of inks from the tri-color (or other, non-black color) and black inkjet cartridges to produce black text and images."  (Stipulation of Settlement, Aug. 26, 2010, ¶ 29.)] |
| _Rich_:  HP published and made representations regarding "page yield" specifications for its inkjet printers and cartridges but did "not disclose that the page yield of a color ink cartridge will be substantially decreased solely by printing black text and graphics."  (_Rich_ Second Am. Compl., ¶¶ 21-26, 28, 51, 53, 63; _Rich_ Opp. to Mot. Dismiss First Am. Compl., Nov. 10, 2006, at 15 [Dkt | Claims that relate to "(F)  HP's Page Yields for the Affected Models and their corresponding inkjet cartridges"<br><br>[The Stipulation of Settlement defines "Page Yields" as "the page yield for an HP inkjet cartridge as stated or reported |

Master File No. C05-3580 JF

| PLAINTIFFS' ALLEGATIONS | RELEASE LANGUAGE* |
|---|---|
| #28] ("HP tells its customers to consider 'page yield' … of its cartridges when deciding whether or not to use HP products."); *see also id.* at 10-11.) | by HP, whether as a reference yield or yield for a given cartridge and printer." (Stipulation of Settlement, Aug. 26, 2010, ¶ 18.)] |
| *Ciolino*: "[T]he 'smart chip' technology is designed and programmed to send a premature and false message to consumers advising them that they will need to purchase a replacement cartridge of ink, when in fact, the printer cartridge is far from empty and is capable of printing hundreds of additional pages." (*Ciolino* Second Consol. Am. Compl. ¶ 2; *see also id.* ¶¶ 23-24, 27, 29, 41, 50, 63, 69; *Ciolino* Opp. to Mot. Dismiss First Consol. Am. Compl., Feb. 3, 2006, at 1-2 [Dkt #28]; *Ciolino* Opp. to Mot. Dismiss Second Consol. Am. Compl., May 12, 2006, at 1-2 [Dkt #41]; *Ciolino* Mot. Certif. Nationwide Class, July 20, 2007, at 3-4, 6-14 [Dkt #60]; *Ciolino* Mot. Certif. Cal. Class, Mar. 26, 2009, at 1-3, 4-13 [Dkt #185].)<br><br>*Rich*: "Even though HP color inkjet printers use substantial amounts of color ink when printing in black text and images, no color **other than black** is discernable on the printer page." (*Rich* Second Am. Compl. ¶ 17; *see also id.* ¶¶ 1, 16-18, 28-29, 47, 50, 63, 64; *Rich* Opp. to Mot. Dismiss First Am. Compl., Nov. 10, 2006, at 1-3, 6, 10-11, 15-16, 18-20 [Dkt #28]; *Rich* Mot. Certif. Class, June 23, 2009, at 3-10 [Dkt #62].) | Claims that relate to "(G) the quantity and other characteristics of printed output from the Affected Models and their corresponding inkjet cartridges" |
| *Ciolino*: "[T]he 'smart chip' prematurely registers the ink as being low and limits a consumer's ability to use all of the ink in his or her printer cartridge." (*Ciolino* Second Consol. Am. Compl. ¶ 29; *see also id.* ¶¶ 2, 22-24, 27, 41, 50, 63, 69; *Ciolino* Opp. to Mot. Dismiss First Consol. Am. Compl., Feb. 3, 2006, at 1-2 [Dkt #28]; *Ciolino* Opp. to Mot. Dismiss Second Consol. Am. Compl., May 12, 2006, at 1-2, 4-6 [Dkt #41]; *Ciolino* Mot. Certif. Nationwide Class, July 20, 2007, at 3-4, 6-14 [Dkt #60]; *Ciolino* Mot. Certif. Cal. Class, Mar. 26, 2009, at 1-3, 4-13 [Dkt #185].)<br><br>*Blennis*: "HP ink cartridges can and do 'expire' even if a significant amount of useable ink remains in the ink cartridge, thereby preventing consumers using [sic] the significant amount of useable ink remaining in an | Claims that relate to "(H) the amount of usable ink in the HP inkjet cartridges used with the Affected Models" |

4

| PLAINTIFFS' ALLEGATIONS | RELEASE LANGUAGE* |
|---|---|
| 'expired' ink cartridge." (*Blennis* Compl. ¶ 17; *see also id.* ¶¶ 2, 3, 46, 53, 64-65, 75, 83, 88; *Blennis* Opp. to Mot. Dismiss, July 27, 2007, at 1-3, 17-18, 20 [Dkt #17]; *Blennis* Mot. Certif. Class, Dec. 8, 2009, at 1-3, 7, 8-9 [Dkt #47].) | |
| *Ciolino*: "HP promotes the 'smart chip' technology through its 'SureSupply' campaign. HP claims that by using 'SureSupply,' consumers will '[n]ever run out of supplies' and will '[s]ave time [a]nd money.' Contrary to these representations, the 'smart chip' increases the cost for consumers to use HP printers because consumers are deceived into discarding printer cartridges that still have usable ink and prematurely purchasing unnecessary replacement cartridges." (*Ciolino* Opp. to Mot. Dismiss Second Consol. Am. Compl., May 12, 2006, at 2 [Dkt #41] (citations omitted); *see also Ciolino* Second Consol. Am. Compl. ¶¶ 28-29, 63; *Ciolino* Mot. Certif. Nationwide Class, July 20, 2007, at 4, 12-14 [Dkt #60]; *Ciolino* Mot. Certif. Cal. Class, Mar. 26, 2009, at 12-13 [Dkt #185].) | Claims that relate to "(I) HP's SureSupply program as it relates to ink status graphics and messaging and related marketing materials" |
| *Ciolino*: "[HP's] 'Smart chips' and the 'SureSupply' campaign deceive consumers into falsely believing that their cartridges are empty and can cause damage to the printer, that their cartridge are expired and must be replaced, or that the warranty coverage on the printer cartridge has ended. Absent from HP's marketing material is any mention of the 'smart chip's' predetermined shut down date or premature signals of ink depletion." (*Ciolino* Second Consol. Am. Compl. ¶ 29; *see also id.* ¶¶ 22, 25-27, 28-29, 35-36, 41, 43-44, 50, 56-57, 62-63, 69, 71; *Ciolino* Opp. to Mot. Dismiss First Consol. Am. Compl., Feb. 3, 2006, at 1-2, 10-11, 15-16 [Dkt #28]; *Ciolino* Opp. to Mot. Dismiss Second Consol. Am. Compl., May 12, 2006, at 2, 4-6 [Dkt #41]; *Ciolino* Mot. Certif. Nationwide Class, July 20, 2007, at 3-4, 7-14 [Dkt #60]; *Ciolino* Mot. Certif. Cal. Class, Mar. 26, 2009, at 1-3, 4-13 [Dkt #185].) <br><br> *Rich*: "Nowhere in its promotional materials, packaging materials, reference materials or warranty materials for its color inkjet cartridges, black inkjet cartridges and color inkjet printers does HP disclose that its color inkjet | Claims that relate to "(J) HP's specifications, marketing, disclosures, warranties, and representations (or lack thereof) regarding the quantity of output, amount of usable ink, or value of ink received from the Affected Models and their corresponding inkjet cartridges" |

DEFENDANT'S STATEMENT IN SUPPORT OF
FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Master File No. C05-3580 JF

| PLAINTIFFS' ALLEGATIONS | RELEASE LANGUAGE* |
|---|---|
| printers use color ink when printing black and white images and text." (*Rich* Second Am. Compl. ¶ 18; *see also id.* ¶¶ 19, 21-26-28, 47, 51, 62, 63; *Rich* Opp. to Mot. Dismiss First Am. Compl., Nov. 10, 2006, at 1-3, 6, 10-11, 15-16, 20-23 [Dkt #28]; *Rich* Mot. Certif. Class, June 23, 2009, at 3-4, 6-10 [Dkt #62].)<br><br>*Blennis*:  "Nowhere in its promotional materials, packaging materials, reference materials or warranty materials does HP disclose" certain information regarding the purported "expiration" date.  (*Blennis* Compl. ¶ 19; *see also id.* ¶¶ 20, 46, 50-51, 53, 56-58, 60, 75; *Blennis* Opp. to Mot. Dismiss, July 27, 2007, at 2-3, 5-9, 12-14, 17 [Dkt #17]; *Blennis* Mot. Certif. Class, Dec. 8, 2009, at 8-9 [Dkt #47].) | |

101000499_8.DOC