Niall P. McCarthy (SBN 160175)
nmccarthy@cpmlegal.com
Justin T. Berger (SBN 250346)
jberger@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

Brian S. Kabateck (SBN 152054)
bsk@kbklawyers.com
Richard L. Kellner (SBN 171416)
rlk@kbklawyers.com
**KABATECK BROWN KELLNER LLP**
644 South Figueroa Street
Los Angeles, CA 90017
Telephone:  (213) 217-5000
Facsimile:  (213) 217-5010

Steven N. Berk *(admitted pro hac vice)*
steven@berklawdc.com
**BERK LAW PLLC**
1225 15th Street, N.W.
Washington D.C. 20005
Telephone:  (202) 232-7550
Facsimile:  (202) 232-7556

[Additional Counsel Listed on Signature Page]

*Counsel for Plaintiffs and the Settlement Class
and On Behalf of the Proposed Settlement Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

|  |  |
|---|---|
| **In Re: HP Inkjet Printer Litigation** | Master File No.: C053580 JF (PVT) |
|  | **PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
|  | **MEMORANDUM OF POINTS AND AUTHORITIES AND SUPPORTING DECLARATIONS AND EVIDENCE FILED CONCURRENTLY HEREWITH** |
| This Document Relates To:<br>All Actions | Date:        January 28, 2011<br>Time:        9:00 A.M.<br>Courtroom:  3, 5th Floor<br>Judge:       Hon. Jeremy Fogel |

# TABLE OF CONTENTS

**NOTICE OF MOTION** ................................................................................................ v

**MEMORANDUM OF POINTS AND AUTHORITIES** ............................................ 1

    **I.**     **INTRODUCTION** ............................................................................ 1

    **II.**    **THE LITIGATION OF THE ACTIONS** ......................................... 1

        A.    The *Ciolino* Action ........................................................... 1

        B.    The *Rich* Action ............................................................... 3

        C.    The *Blennis* Action .......................................................... 4

    **III.**   **SETTLEMENT NEGOTIATIONS** .................................................. 5

        A.    Injunctive Relief ................................................................ 5

        B.    E-Credits ........................................................................... 6

        C.    Other Aspects of the Settlement ........................................ 7

    **IV.**   **NOTICE AND CLAIMS ADMINISTRATION** ............................... 7

    **V.**    **LEGAL STANDARD** .................................................................... 8

        A.    Settlements That Are Fair, Adequate, and Reasonable Warrant Approval by the Court ........................................ 8

        B.    The Law Favors Prompt Resolution of Class Action Claims ..................... 9

    **VI.**   **ANALYSIS:  THE SETTLEMENT SATISFIES THE STANDARDS FOR JUDICIAL APPROVAL** ....................... 9

        A.    The Settlement Resulted From Arm's-Length Negotiations ........................ 9

        B.    The Strength of the Plaintiffs' Cases Supports a Finding of Fairness ......... 10

        C.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation Support Final Approval ................... 12

        D.    The Risk of Maintaining Class Action Status Supports a Finding of Fairness ............................................... 12

        E.    The Extent of Discovery Completed and the Stage of the Proceedings Also Favor Final Approval ................ 13

        F.    The Experience and Views of Counsel Support Final Approval ............... 13

        G.    The Reaction of the Class Members to the Proposed Settlement Warrants Final Approval ........................... 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VII.    THE OBJECTIONS ARE WITHOUT MERIT**................................................ 15

    A.    Objectors Ignore that the Principal Benefit of this Settlement is Injunctive Relief ........................................................................................................ 15

    B.    In Light of the Significant Injunctive Relief, the Requested Attorneys' Fees are Reasonable ................................................................................. 18

    C.    The Release is Not Overbroad .................................................................... 21

    D.    All Three Objectors are Professional Objectors with No Experience Prosecuting Class Actions .......................................................................... 22

    E.    The Proposed Settlement Class Satisfies the Requirements of Rule 23 ..... 24

**VIII.    CONCLUSION**................................................................................................ 25

1

## **TABLE OF AUTHORITIES**

2

## **Cases**

3

*Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988), aff'd, 899 F.2d 21
4
(11th Cir. 1990) ................................................................................................................ 9

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S. Ct. 57,
5
50 L. Ed. 2d 75 (1976) .................................................................................................... 25

6
*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ...................................................... 9, 14

7
*Churchill Village, LLC v. General Electric*, 361 F.3d 566 (9th Cir. 2004) ................................... 14

8
*Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir. 1992) ....................................................... 8, 9, 21

9
*Dukes v. Wal-Mart, Inc.*, 603 F.3d 571 (9th Cir. 2010) ........................................................... 24, 25

10
*Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 U.S. Dist. LEXIS 112459, at *1
11
(N.D. Cal., Aug. 6, 2008) ............................................................................................... 20, 21

12
*Franklin v. Kaypro Corp.*, 884 F.2d 1222 (9th Cir. 1989) ................................................................ 9

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..................... 8, 10, 12, 13, 14, 17, 19, 24
13

14
*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, MDL Docket No. 901,
1992 U.S. Dist. LEXIS 14337, at *8 (C.D. Cal. June 10, 1992) ................................................ 14

15
*In Re Heritage Bond Litig.*, No. MDL 02-ML-1475, 2005 WL 1594403, at *2
16
(C.D. Cal. June 10, 2005) ................................................................................................. 10

17
*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ....................................................... 8

18
*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................ 9

19
*In re Prudential*, 278 F.3d 175, passim (3d. Cir. 2002) ................................................................ 22

20
*Kirkorian v. Borelli*, 695 F. Supp. 446 (N.D. Cal. 1988) ................................................................ 9

21
*Lobatz v. U.S. West Cellular of California, Inc.*, 222 F.3d 1142 (9th Cir. 2000) .......................... 22

22
*Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010) ................................... 23

23
*Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977) ..................................................... 8

24
*Nat'l Rural Telecomm. Cooperative. v. DirecTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ....... 12, 14

25
*Officers for Justice v. Civil Service Com.*, 688 F.2d 615 (9th Cir. 1982) ..................................... 8, 9

26
*O'Keefe v. Mercedes-Benz United States, LLC*, 214 F.R.D. 266 (E.D. Penn. 2003) .................... 22

27
*Perez v. Asurion Corp.*, No. 06-20734-CIV-SEITZ/MCALILEY,
2007 U.S. Dist. LEXIS 66931, at *4-5 (S.D. Fla. Aug. 8, 2007) ............................................ 20

28
*Rebney v. Wells Fargo Bank*, 220 Cal. App. 3d 1117 (Cal. App. 1st Dist.1990) .......................... 24

*Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658 (S.D.N.Y. 1977) .......................................... 8

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) ................................................ 10

*Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) ......... 22

*Synfuel v. BellSouth Telecommunications, Inc.*, 463 F.3d 646 (7th Cir. 2006) ............................. 17

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976)...................................................... 12

**Statutes**

28 U.S.C. § 1712(a)........................................................................................................................... 19

28 U.S.C. § 1712(b) .......................................................................................................................... 19

**Rules**

Fed. R. Civ. P. 23, *et seq.* ..................................................................................................... 8, 24, 25

**Other Authorities**

109 S. Rpt. 14 (2005) ................................................................................................................. 19, 20

4 Newberg § 11:55, at p.168 ............................................................................................................ 22

4 Newberg § 12:15, at p. 312 ........................................................................................................... 21

*Did the Right Make America a Lawsuit Nation? Thomas Geoghegan's See You In Court*,
   12 Tex. R. L. & Pol. 477 (2008) ................................................................................................ 23

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on January 28, 2011, at 9:00 a.m., or as soon thereafter as it may be heard, in Courtroom 3 of the above-entitled Court, Plaintiffs Daniel Feder, Nicklos Ciolino, Carl K. Rich, David Duran, Jackie Blennis, and David Brickner ("Plaintiffs") will, and hereby do, move for an order finally approving the proposed class action settlement.

This Motion is based on this Notice of Motion; the attached Memorandum of Points and Authorities; the Declarations of Niall McCarthy, Cameron Azari, and the Honorable James L. Warren (Ret.); all supporting exhibits, settlement papers, and other documents; the pleadings, orders, transcripts, and other papers on file in this matter; and any further evidence and arguments as may be presented at the hearing of this matter.

DATED:  January 14, 2011                    Respectfully submitted,

                          By:        */s/ Niall P. McCarthy*
                                          Niall P. McCarthy
                                  COTCHETT, PITRE & McCARTHY

                                  *Counsel for Plaintiffs and the Settlement Class and*
                                  *On Behalf of the Proposed Settlement Class*

---

1                   **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.**       **INTRODUCTION**

3         Plaintiffs Daniel Feder, Nicklos Ciolino, Carl K. Rich, David Duran, Jackie Blennis, and

4  David Brickner ("Plaintiffs") respectfully seek final approval of this consolidated class action

5  settlement (the "Settlement") with defendant Hewlett-Packard Company ("HP").

6         On October 1, 2010, this Court granted preliminary approval of the class action settlement,

7  and set a final approval and attorneys' fees hearing for January 28, 2011. The Settlement now

8  warrants final approval by this Court, and meets the Ninth Circuit's standards for final approval.

9  First, as discussed below, the Settlement is entitled to a presumption of fairness, since it was

10  reached through arm's-length, non-collusive negotiations between experienced counsel, after a

11  thorough exchange of information and with the assistance of an experienced mediator.

12  Furthermore, the Settlement is fundamentally reasonable, in light of the uncertainty of Plaintiffs'

13  claims and the risks and costs associated with further litigation. Finally, the reaction of the class

14  weighs in favor of final approval: the notice was e-mailed to over 13 million class members and

15  only 810 (less than 1/100 of a percent) have opted out to date. Only three objections were filed

16  with the Court. Accordingly, Plaintiffs respectfully request that the Court approve the Settlement

17  in its entirety and overrule the objections.

18  **II.**       **THE LITIGATION OF THE ACTIONS**

19         This settlement involves three separate yet intertwined class actions that were brought with

20  respect to HP **inkjet** printers: the *Ciolino*, *Rich*, and *Blennis* actions.

21         **A.**     **The *Ciolino* Action**

22         On September 6, 2005, plaintiff Nicklos Ciolino commenced an action against HP in this

23  Court that challenged the "low on ink" ("LOI") warnings deployed on several lines of HP inkjet

24  printers as misleading and deceptive. HP aggressively defended the lawsuit with a number of

25  arguments, including that the low-on-ink messages were straightforward and did not state or

26  require consumers to replace their inkjet cartridges. Rather, the messages informed consumers

27  that they were low-on-ink, and that they should consider having a replacement cartridge available

28  for when print quality was no longer acceptable to them.

1      In bridging the gap toward settlement, both sides made significant but rational

2  compromises.  Plaintiffs conceded that low-on-ink messages were not deceptive or misleading *per*

3  *se*, given the language of the message did not instruct consumers to discard the cartridge.

4  However, Plaintiffs consistently maintained that low-on-ink messages using graphic images

5  featuring near-empty cartridges were deceptive and misleading and had the effect of causing some

6  consumers to prematurely discard their cartridges despite the language of the warning.

7  Significantly, in connection with this proposed settlement, HP agreed to eliminate those graphic

8  image warnings in a series of business practice changes.

9      Although some consumers surely discarded cartridges containing useable ink, significant

10  damages in this case were unattainable.  Because deployment of the low on ink messaging had a

11  wide variance (projecting when the cartridge contained as much as 30% of remaining ink or as

12  little as 0%) it would be difficult if not impossible to determine how much ink remained in a

13  cartridge when discarded by a consumer (particularly many years after the fact).  Certifying a

14  damages class would be problematic, and even if such a class could be certified, proving

15  individual damages would be highly speculative and more than likely not succeed.  Thus,

16  Plaintiffs, after several mediation sessions, and a defeated class certification motion in *Ciolino*,

17  conceded that any cash (or cash-like relief) could rightly be a small percentage of the total

18  compensation provided to the class.

19      Further complicating the litigation and increasing the risk substantially of ultimately

20  succeeding were rulings by the Court that limited Plaintiffs' negotiating leverage tremendously.

21  Most prominent among those rulings was this Court's decision denying nationwide class

22  certification on July 25, 2008.  Since that decision primarily rested on "manageability" grounds, it

23  did not limit plaintiffs from moving forward with a California-only state class, but it did for

24  practical purposes have a profound impact on settlement negotiations and the likelihood of success

25  in this litigation.  Adding to the uncertainty of success was the Court's companion decision

26  denying HP's Motion for Summary Judgment.  That decision included a discussion of Plaintiffs'

27  substantive claims that was skeptical and far from positive.  For example, the Order stated:

28  "While the evidence is weak, a reasonable jury could find that [class representative] Feder has

1  suffered a cognizable injury." July 25, 2008 Order at 6:4-5 (Docket No. 170). And on the next

2  page, the Court repeated: "Again, while Plaintiffs' evidence is weak, it is sufficient to survive

3  summary judgment." *Id.* at 7:18. Furthermore, the words of the Court's ruling raised fundamental

4  doubt as to whether even a statewide class would be approved. In effect, strident negotiation was

5  the best opportunity to assure that the millions of members in the class would receive some relief.

6       **B.**    **The *Rich* Action**

7       On May 22, 2006, plaintiff Carl K. Rich commenced an action against HP in this Court

8  based on a claim that HP failed to disclose that its color inkjet printers use color ink in addition to

9  black ink when printing black text and images (this technology is referred to as "underprinting").

10  The Second Amended Complaint was filed on January 12, 2007, following the Court's order of

11  December 4, 2006 granting HP's Motion to Dismiss. Based on this order, Plaintiffs dropped their

12  claims for breach of contract, breach of express and implied warranty, and breach of the covenant

13  of good faith and fair dealing.

14       On June 23, 2009, Plaintiffs filed a motion to certify two classes – a damages class

15  consisting solely of California consumers, and a proposed nationwide class for injunctive relief

16  only. On December 7, 2009, HP filed its Opposition to Plaintiffs' motion for class certification,

17  and simultaneously filed a Motion for Summary Judgment, where it argued, *inter alia*, that: (1)

18  plaintiffs cannot establish that HP had an affirmative duty to disclose the allegedly concealed

19  information, and each of their claims fails as a result; (2) plaintiffs cannot establish that HP caused

20  them any harm, or that the allegedly concealed information was material to their purchase

21  decisions, thus entitling HP to summary judgment on plaintiffs' fraudulent concealment and UCL

22  claims; and (3) plaintiffs' purported "claim" for unjust enrichment fails because it necessarily

23  depends on, and falls with, their other fraud-based claims. In light of the parties' extensive

24  settlement discussions, neither plaintiffs' Motion for Class Certification nor HP's Motion for

25  Summary Judgment has been heard.

26       As with the *Ciolino* action, in bridging the gap toward settlement of the *Rich* action, both

27  sides made significant but rational compromises. Plaintiffs accepted that underprinting is a

28  legitimate and common technology that increases print quality. HP agreed to provide additional

1  disclosures to consumers regarding the use of underprinting, its pros and cons, and measures that

2  can be used to disable it.

3      Moreover, as with the *Ciolino* action, significant damages were not appropriate or

4  attainable in this *Rich* matter for several reasons.  First, although plaintiffs were confident they

5  could establish that underprinting caused consumers to use color ink when they would not have

6  expected to, it would be difficult if not impossible to determine how much color ink is actually

7  expended by consumers due to underprinting.  Furthermore, it would be difficult to establish that

8  had consumers known about underprinting, they would have chosen to disable it, and thereby

9  sacrifice the benefit of increased print quality due to underprinting.  Accordingly, a case to obtain

10  individual damages would be speculative.  Thus, plaintiffs agreed that any cash (or cash-like

11  relief) must be a small percentage of the total compensation provided to the class.

12      **C.    The *Blennis* Action**

13      On January 17, 2007, Plaintiffs Jackie Blennis and David Brickner commenced an action

14  against HP in this Court based on a claim that HP designed certain of its inkjet printers and inkjet

15  cartridges to shut down on an undisclosed expiration date, at which point consumers are prevented

16  from using the ink that remains in the expired cartridge and from using all of the printer's

17  functions (including scanning or faxing documents) until the expired cartridge is replaced.

18      On March 25, 2008, the Court dismissed Plaintiff's claims for express warranty, implied

19  warranty, trespass to chattels and conversion.  On December 8, 2009, Plaintiffs filed their Motion

20  for Class Certification, seeking to certify a class consisting of "All persons or entities in the United

21  States who own one or more models of Hewlett-Packard inkjet printers that use ink cartridges that

22  have an expiration date."  In light of the parties' extensive settlement discussions, the Motion for

23  Class Certification has not yet been heard.

24      As with *Ciolino* and *Rich*, significant damages were not appropriate or attainable in this

25  *Blennis* matter for several reasons.  First, it would be difficult to ascertain the members of the

26  class.  Furthermore, HP did provide some disclosures to consumers regarding ink expiration, and

27  HP believed that it had legitimate technical reasons for employing ink expiration dates in the

28  limited number of HP printer models where such expiration dates were employed.  Accordingly, a

1  case to obtain individual damages would be highly speculative.  Thus, as in the *Ciolino* and *Rich*

2  actions, Plaintiffs agreed that any cash (or cash-like relief) must be a small percentage of the total

3  compensation provided to the class.

4  **III.    SETTLEMENT NEGOTIATIONS**

5           Throughout the *Ciolino*, *Rich*, and *Blennis* actions, counsel for the parties engaged in

6  multiple informal but comprehensive settlement discussions, giving due consideration to the

7  parties' respective positions.  Plaintiffs' counsel in the course of the litigations had conducted an

8  extensive investigation into the facts and law relating to the matters alleged in their respective

9  complaints.  The investigation included:  (1) the depositions of 17 witnesses; (2) the production of

10 more than 250,000 pages of documents; (3) more than 100 written discovery requests; (4) the

11 inspection of several of the HP Inkjet printers at issue; (5) consultations with industry personnel;

12 (6) extensive work with experts and testing by those experts; (7) numerous interviews of witnesses

13 and putative members of the classes; (8) the evaluation of information provided by current or

14 former employees of HP (including the HP engineers with primary responsibility for the design of

15 some of the HP inkjet printer models at issue and matters related thereto); and (9) legal research as

16 to the sufficiency of the claims.  *See* McCarthy Dec. ¶ 26.

17          As a result of the foregoing investigation, Plaintiffs and their counsel obtained

18 comprehensive knowledge of HP's printer technology which extended to all three actions, and

19 received, examined, and analyzed information, documents, printers, components, and materials

20 that they deemed necessary and appropriate to enable them to enter into a settlement on a fully

21 informed basis.  Settlement was ultimately reached as a result of extensive arm's length

22 negotiations between counsel for Plaintiffs in the *Ciolino*, *Rich*, and *Blennis* actions, on the one

23 hand, and counsel for HP, on the other hand, occurring over several years and multiple mediation

24 sessions with several highly respected and nationally-recognized mediators—the Honorable

25 Daniel Weinstein of JAMS (*Ciolino*), the Honorable James L. Warren of JAMS (in the *Ciolino*

26 and *Rich* actions), and Alexander S. Polsky, Esq., of JAMS (*Blennis*).  *See id.* ¶ 27.

27          **A.      Injunctive Relief**

28          As discussed above, the *Ciolino*, *Rich*, and *Blennis* actions focus on alleged nondisclosure

1    of information about certain features of, and technology used in, HP's inkjet printers.  The

2    injunctive relief provided to the Settlement Class addresses the core complaint in each case by

3    requiring HP to:  (1) discontinue the use of certain pop-up messaging that includes the graphic

4    image of an ink gauge, ruler, or container of ink, (2) disclose additional information regarding the

5    HP technology that forms the basis of the *Ciolino*, *Rich*, and *Blennis* actions on HP's website (a

6    location where HP customers already obtain information about and can purchase HP printer

7    products); and (3) disclose additional information in the packaging, manuals, and/or user

8    interfaces for HP inkjet printers.  Specifically, these changes and disclosures include the

9    following:

      (1)    HP will incorporate disclosures into its website, user manuals, and/or user interfaces explaining that HP's low-on-ink messages (the technology at issue in *Ciolino*) are based on estimated ink levels and that actual ink levels may vary, and that the user does not have to replace a print cartridge when a low-on-ink message is received but rather may continue printing until the user is not satisfied with the print quality of the printed material or, if applicable, when the user reaches a "replace cartridge" message.

      (2)    HP will incorporate on its website and/or user manuals disclosures regarding "underprinting"—the inkjet technology at issue in the *Rich* action, whereby certain HP color inkjet printers may, in certain circumstances depending on the printer settings and customer inputs, use a combination of inks from the tri-color (or other, non-black color) and black inkjet cartridges to produce black text and images. These disclosures will include a description of what underprinting is, why it is used, and some of the options for disabling or minimizing the use of underprinting. HP also will include disclosures regarding page yields including a summary of HP's ISO testing for page yields and an explanation that actual yield varies depending on the content of printed pages and other factors.

      (3)    HP will incorporate disclosures into its website and/or product packaging regarding ink expiration—the technology at issue in the *Blennis* action, whereby HP may use built-in dates on which certain inkjet cartridges will stop working— including an explanation of the inkjet printers and cartridges that are subject to ink expiration, why HP employs ink expiration dates for certain printer models and how that date is determined, and how ink expiration works.

23    These disclosures achieve the primary objective of the *Ciolino*, *Rich*, and *Blennis* actions.

24    **B.**    **E-Credits**

25          The parties also negotiated financial relief to the class members in the *Ciolino*, *Rich*, and

26    *Blennis* actions.  Given the current litigation posture of the cases, Plaintiffs and their counsel

27    believe that the level of compensation is eminently fair and reasonable.  In settlement of these

28    three matters, HP has agreed to create a pool of up to $5,000,000 in e-credits that can be used for

1   the purchase of printers or printer supplies online at HP's website (www.shopping.hp.com).  Each

2   participating settlement class member in the *Ciolino* action will be eligible to receive up to $5.00

3   in e-credits for each *Ciolino* printer model purchased or received as a gift.  Each participating

4   settlement class member in the *Rich* action will be eligible to receive up to $2.00 in e-credits for

5   each *Rich* printer model purchased or received as a gift.  Each participating settlement class

6   member in the *Blennis* action will be eligible to receive up to $6.00 in e-credits for each *Blennis*

7   printer model purchased or received as a gift.  The relief may be combined for the same printer.

8       **C.**    **Other Aspects of the Settlement**

9       HP agreed to pay for the class notice and administration (up to $950,000), and Class

10  Counsel was able to secure very comprehensive notice by utilizing the economies of scale of

11  having the notice combined for the *Ciolino*, *Rich*, and *Blennis* actions.

12      In addition, HP has agreed, subject to Court approval, to pay a stipend not to exceed

13  $1,000 to each named Plaintiff in the *Ciolino*, *Rich*, and *Blennis* actions.  HP has also agreed,

14  subject to the Court's approval, to separately pay to Plaintiffs' counsel's attorneys' fees, costs, and

15  expenses in an amount not to exceed $2,900,000.  This amount is inclusive of all fees and costs of

16  class counsel in the *Ciolino*, *Rich*, and *Blennis* actions.  Plaintiffs' counsel negotiated attorneys'

17  fees after the class benefit was negotiated, and agreed to a fee that represents a fraction of the

18  lodestar hours actually worked on the actions.  McCarthy Dec. ¶ 31; Declaration of the Honorable

19  James L. Warren (Ret.) ("Warren Dec.") ¶ 5.

20  **IV.**    **NOTICE AND CLAIMS ADMINISTRATION**

21      Pursuant to the Preliminary Approval Order, notice was provided by the following means:

22  (a) between November 8 and November 22, 2010, the Long Form Notice was sent to the last

23  known e-mail addresses of 13,387,489 settlement class members; (b) between November 15 and

24  November 21, 2010, notice was published in PARADE magazine, USA WEEKEND, PEOPLE and CIO

25  magazine; and (c) online "banner" advertisements appeared on YAHOO.COM and other websites

26  through 24/7 REAL MEDIA NETWORK, from November 4, 2010 to December 5, 2010.  Azari Dec.

27  ¶¶ 9-16.  Complete details of the notice program are set forth in the declaration of Cameron Azari.

28  Plaintiffs, class counsel, and the notice expert that they have retained anticipate that this notice

1    reached approximately 74% of class members based on conservative estimates. Azari Dec. ¶ 18.

2    HP also provided appropriate notice to the state Attorneys' General pursuant to the provisions of

3    CAFA.

4    **V.      LEGAL STANDARD**

5         **A.      Settlements That Are Fair, Adequate, and Reasonable Warrant Approval by**

6                **the Court**

7         Under Rule 23, a court should approve a settlement if the settlement is fair, reasonable, and

8    adequate. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *see also In re Mego*

9    *Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *Marshall v. Holiday Magic, Inc.*, 550

10   F.2d 1173, 1178 (9th Cir. 1977).

11        In determining the fairness of a proposed settlement, the Court is guided by the following

12   factors identified by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.

13   1998):

14             Assessing a settlement proposal requires the district court to balance a number of
               factors: the strength of the plaintiffs' case; the risk, expense, complexity, and
15             likely duration of further litigation; the risk of maintaining class action status
               throughout the trial; the amount offered in settlement; the extent of discovery
16             completed and the stage of the proceedings; the experience and views of counsel;
               the presence of a governmental participant; and the reaction of the class members
17             to the proposed settlement. To survive appellate review, the district court must
               show it has explored comprehensively all factors (citations omitted).
18

19        District courts have broad discretion in evaluating proposed settlements, *Class Plaintiffs*,

20   955 F.2d at 1291-92; *Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 625 (9th Cir. 1982).

21   A court should approve a settlement unless the settlement, "taken as a whole, is so unfair on its

22   face as to preclude judicial approval." *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667

23   (S.D.N.Y. 1977) (citations omitted). The issue is not whether the settlement could have been

24   better, but whether it is fair, reasonable, adequate, and free from collusion. *Hanlon*, 150 F.3d at

25   1027.

26        Moreover, in considering the adequacy of a proposed settlement, the goal of settlement is

27   to avoid the determination of contested issues; thus "the settlement or fairness hearing is not to be

28   turned into a trial or rehearsal for trial on the merits." *Officers for Justice*, 688 F.2d at 625; *accord*

1   *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617 (N.D. Cal. 1979).  As explained by the Ninth Circuit

2   in *Officers for Justice*, 688 F.2d at 625:

> [T]he court's intrusion upon what is otherwise a private consensual agreement
> negotiated between the parties to a lawsuit must be limited to the extent necessary
> to reach a reasoned judgment that the agreement is not the product of fraud or
> overreaching by, or collusion between, the negotiating parties, and that the
> settlement, taken as a whole, is fair, reasonable, and adequate to all concerned. . . .
> The proposed settlement is not to be judged against a hypothetical or speculative
> measure of what might have been achieved by the negotiators (citations omitted
> and emphasis in original).

8       The trial court is also entitled to rely upon the judgment of experienced counsel for the

9   parties.  *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 538-39 (S.D. Fla. 1988), aff'd,

10  899 F.2d 21 (11th Cir. 1990).  Indeed, where the counsel recommending approval of the

11  settlement are known to the Court as competent and experienced, significant weight may be given

12  to their opinion.  *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988), disapproved on

13  other grounds by *Franklin v. Kaypro Corp.*, 884 F.2d 1222 (9th Cir. 1989).

14      **B.      The Law Favors Prompt Resolution of Class Action Claims**

15      The Court must "be mindful of the Ninth Circuit's policy favoring settlement, particularly

16  in class action law suits."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal.

17  2008); *see also Officers for Justice*, 688 F.2d at 625 ("it must not be overlooked that voluntary

18  conciliation and settlement are the preferred means of dispute resolution.  This is especially true in

19  complex class action litigation . . . .").  As the Ninth Circuit set forth in *Class Plaintiffs*, 955 F.2d

20  at 1276:

> We are not permitted to 'substitute our notions of fairness for those of the district
> judge and the parties to the agreement.'  This is especially true in light of the
> strong judicial policy that favors settlements, particularly where complex class
> action litigation is concerned (citations omitted).

24  **VI.      ANALYSIS:  THE SETTLEMENT SATISFIES THE STANDARDS FOR JUDICIAL**

25      **APPROVAL**

26      **A.      The Settlement Resulted From Arm's-Length Negotiations**

27      The Court should begin its analysis with a presumption that the Settlement is fair and

28  should be approved.  The Ninth Circuit has repeatedly ruled that the courts "put a good deal of

1   stock in [class settlements that are] the product of arms-length, non-collusive, negotiated

2   resolution." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Hanlon v.*

3   *Chrysler Corp.* 150 F.3d at 1011, 1027; *In Re Heritage Bond Litig.*, No. MDL 02-ML-1475, 2005

4   WL 1594403, at *2 (C.D. Cal. June 10, 2005).

5       Here, the Settlement was reached only after arms-length, good faith negotiations and only

6   with the assistance of an experienced mediator and negotiations over a period of years. *See*

7   McCarthy Dec. ¶ 27; Warren Dec. ¶ 2. As such, there is an absence of any indicia of collusion.

8   Class Counsel negotiated the Settlement in vigorous and intense negotiations, including

9   participating in mediations with highly experience mediators. The parties reached settlement after

10  contentious negotiations, spread over several years, and the formal and informal exchange of

11  significant amounts of relevant information and data. McCarthy Dec. ¶ 26; Warren Dec. ¶¶ 3-4.

12  Second, the parties engaged in a substantial exchange of relevant data in advance of the mediation.

13  As a result of these efforts, the parties had sufficient information to evaluate the strengths and

14  weaknesses of the Plaintiffs' claims and defenses, whether to pursue litigation or settle, and the

15  appropriate settlement value for the claims at issue. *See* McCarthy Dec. ¶ 27; Warren Dec. ¶ 5.

16      **B.      The Strength of the Plaintiffs' Cases Supports a Finding of Fairness**

17      The first *Hanlon* factor – the strength of Plaintiffs' case – supports a finding of fairness.

18  Disputed legal and factual issues on which Plaintiffs would have to prevail in order to succeed in

19  any of the three consolidated cases were plentiful. Indeed, Plaintiffs have already suffered several

20  unfavorable rulings on the merits.

21      Although Plaintiffs were confident they could establish that some of HP's "low on ink"

22  warnings were inaccurate, no warning actually and explicitly directs the consumer to "throw out

23  your cartridge," nor does the activation of the warning shut down the cartridge prematurely.

24  Moreover, it would be difficult if not impossible to determine how much ink remains in a cartridge

25  when discarded by a consumer (particularly many years after the fact). Accordingly, a case to

26  obtain individual damages would be highly speculative and would more than likely not succeed.

27      Moreover, the Court's decision on July 25, 2008, denying HP's Motion for Summary

28  Judgment, included a discussion of Plaintiffs' substantive claims that was skeptical of Plaintiffs'

1    class claims and raised some doubt as to whether even a statewide class would be approved.

2           Similarly, with respect to the *Rich* case, which alleged that HP failed to disclose that its

3    color inkjet printers use color ink in addition to black ink when printing black text and images

4    (this technology is referred to as "underprinting"), HP successfully narrowed Plaintiffs' claims

5    with a Motion to Dismiss, granted on December 4, 2006.  Based on this order, plaintiffs dropped

6    their claims for breach of contract, breach of express and implied warranty, and breach of the

7    covenant of good faith and fair dealing.

8           On December 7, 2009, HP filed a Motion for Summary Judgment, where it argued, *inter*

9    *alia*, that:  (1) plaintiffs cannot establish that HP had an affirmative duty to disclose the allegedly

10   concealed information, and each of their claims fails as a result; (2) plaintiffs cannot establish that

11   HP caused them any harm, or that the allegedly concealed information was material to their

12   purchase decisions, thus entitling HP to summary judgment on plaintiffs' fraudulent concealment

13   and UCL claims; and (3) plaintiffs' purported "claim" for unjust enrichment fails because it

14   necessarily depends on, and falls with, their other fraud-based claims.  There is no ruling on the

15   motion.

16          As with the *Ciolino* action, Plaintiffs faced significant and fundamental factual issues in

17   the *Rich* action, both sides made significant but rational compromises.  Plaintiffs accepted that

18   underprinting is a legitimate and common technology that increases print quality.  HP agreed to

19   provide additional disclosures to consumers regarding the use of underprinting, its pros and cons,

20   and measures that can be used to disable it.  Moreover, for the reasons stated above, significant

21   damages were not appropriate or attainable in this *Rich* matter for several reasons.

22          Finally, the *Blennis* action faced significant legal and factual hurdles as well.  HP filed a

23   Motion to Dismiss the complaint, which was granted on March 25, 2008, resulting in dismissal of

24   Plaintiff's claims for express warranty, implied warranty, trespass to chattels and conversion.  As

25   stated above, significant damages were not appropriate or attainable in this *Blennis* matter for

26   several reasons.

27          If HP were to succeed in establishing any of their factual or legal defenses, Plaintiffs'

28   claims would be severely, if not completely, diminished.  In light of this risk, the proposed

1    settlement is fair and reasonable.

2        **C.**     **The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

3               **Support Final Approval**

4       The second *Hanlon* factor – the risk, expense, complexity, and likely duration of further

5 litigation – unquestionably supports final approval.  In most cases, "unless the settlement is clearly

6 inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with

7 uncertain results." *Nat'l Rural Telecomm. Cooperative. v. DirecTV, Inc.*, 221 F.R.D. 523, 526

8 (C.D. Cal. 2004).  Indeed, the Ninth Circuit has noted that settlement is encouraged in class

9 actions where possible: "there is an overriding public interest in settling and quieting litigation …

10 particularly… in class action suits which are now an ever increasing burden to so many federal

11 courts and which frequently present serious problems of management and expense."  *Van*

12 *Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

13       To put it simply:  the first of these cases was filed **over five years ago**, and Plaintiffs have

14 yet even to achieve certification of any of the three classes.

15       The myriad factual and legal obstacles facing Plaintiffs not only pose great risk of losing

16 altogether, but also pose a great risk of spending several more years, thousands of attorney time,

17 hundreds of thousands of dollars in costs, and vast resources of the Court, on an uncertain

18 outcome.  Accordingly, in light of the risk of proceeding with complex and costly litigation, the

19 settlement is fair and reasonable.

20        **D.**     **The Risk of Maintaining Class Action Status Supports a Finding of Fairness**

21       The next *Hanlon* factor – the risk of maintaining class action status – also supports a

22 finding of fairness.  Certifying a class, and maintaining that certification, would be exceedingly

23 difficult.  Indeed, in the *Ciolino* action, this Court **denied nationwide class certification** on July

24 25, 2008.  In briefing completed prior to this Settlement, HP vigorously contested certification of a

25 California-only class, on multiple grounds.

26       In the *Rich* action, on June 23, 2009, Plaintiffs filed a motion to certify two classes – a

27 damages class consisting solely of California consumers, and a proposed nationwide class for

28 injunctive relief only.   On December 7, 2009, HP filed its Opposition to Plaintiffs' motion for

1  class certification, in which it raised multiple arguments that would have been difficult to

2  overcome.  Plaintiffs would face the same challenges to class certification in the *Blennis* action.

3        Accordingly, compounding the risk that Plaintiffs would not be able to prove their case on

4  the merits, is a very real risk that the Court would deny class certification – which it has already

5  done once.

6        **E.**     **The Extent of Discovery Completed and the Stage of the Proceedings Also**

7                **Favor Final Approval**

8        The next *Hanlon* factor – the extent of discovery completed and the stage of the

9  proceedings – also favors final approval.  As discussed above, each of the three consolidated cases

10  is procedurally advanced.  Motions to dismiss, motions for class certification, and motions for

11  summary judgment were all either decided or briefed prior to settlement.  Moreover, the parties

12  engaged in significant amounts of discovery and investigation, including:  (1) the depositions of

13  17 witnesses; (2) the production of more than 250,000 pages of documents; (3) more than 100

14  written discovery requests; (4) the inspection of several of the HP Inkjet printers at issue; (5)

15  consultations with industry personnel; (6) extensive work with experts and testing by those

16  experts; (7) numerous interviews of witnesses and putative members of the classes; and (8) the

17  evaluation of information provided by current or former employees of HP (including the HP

18  engineers with primary responsibility for the design of some of the HP inkjet printer models at

19  issue and matters related thereto).  *See* McCarthy Dec. ¶ 26.

20        **F.**     **The Experience and Views of Counsel Support Final Approval**

21        The next *Hanlon* factor – the experience and views of counsel – also supports final

22  approval of the Settlement.

23          "'Great weight' is accorded to the recommendation of counsel, who are most
        closely acquainted with the facts of the underlying litigation."  This is because

24          "parties represented by competent counsel are better positioned than courts to
        produce a settlement that fairly reflects each party's expected outcome in the

25          litigation."  Thus, "the trial judge, absent fraud, collusion, or the like, should be
        hesitant to substitute its own judgment for that of counsel."

26

27  *Nat'l Rural Telecomms.*, 221 F.R.D. at 528 (citations omitted); *see also In re First Capital*

28  *Holdings Corp. Fin. Prods. Sec. Litig.*, MDL Docket No. 901, 1992 U.S. Dist. LEXIS 14337, at

1    *8 (C.D. Cal. June 10, 1992) (finding belief of counsel that proposed settlement represented most

2    beneficial result for class compelling factor in approving settlement).

3         Both Class Counsel and counsel for HP are experienced in class-action litigation and other

4    complex litigation, acted in good faith, and both have represented their clients' best interests in

5    reaching the Settlement. *See* McCarthy Dec. ¶¶ 32. After careful and thorough consideration,

6    experienced Class Counsel have concluded that the Settlement is fair, adequate, and reasonable

7    and in the best interests of the Class as a whole. *See* McCarthy Dec. ¶ 32.

8    **G.    The Reaction of the Class Members to the Proposed Settlement Warrants**

9    **Final Approval**

10        The final applicable *Hanlon* factor – the reaction of the class members to the proposed

11   settlement – further supports final approval. Over 13 million class members received e-mail

12   notice, plus millions of others received publication notice. Only three have filed objections with

13   the Court per the instructions in the notice. Only 810, a miniscule fraction of those who received

14   e-mail notice, have excluded themselves. The objection and opt-out deadlines passed on January

15   3, 2011. The opt-outs and objections are less than 1% of the claims received to date.[1]

16        Accordingly, the claim and exclusion rate show that the class largely favors the settlement.

17   By way of comparison, in *Boyd*, 485 F. Supp. at 610, the court approved a class action settlement

18   in which 160 out of 1,127 class members (nearly 16% of the class) plus three of the four named

19   plaintiffs filed objections. *Id.* at 616, 624; *see also Churchill Village, LLC v. General Electric*,

20   361 F.3d 566, 577 (9th Cir. 2004) (Ninth Circuit upheld district court's approval of a settlement

21   involving 90,000 class members, when there were 500 opt-outs and 45 objections).[2]

22        Moreover, while Class Counsel or the Claims Administrator received approximately 400 e-

23   mails from class members with concerns or comments regarding the Settlement or HP, several

24   such class members, who initially critical, expressed their gratitude for the work of Counsel and

25   the Settlement, after the full context of the Settlement was explained to them. Moreover, several

26

27   [1]   The claims period ends on February 15, 2011. Prior to the Fairness Hearing, Plaintiffs will
           provide the Court with the number of claims submitted to date.

28   [2]   Moreover, this *Hanlon* factor should not be given as much weight as in the typical case,
           because the greatest benefit to the class in this case is the injunctive relief, as described above.

1    e-mails were critical of HP, independent of these cases.

2        For example, after initially criticizing the settlement and receiving follow-up communication

3    from Class Counsel, one class member wrote:

4            I know the many attorneys did the best possible and do not fault the effort, your
             skills, nor have issue with your compensation. I am sure for many attorneys their
5            cut may not cover out of pocket costs. Very frustrating for all, when on the surface
             HP's intent and the issues seems so logical and clear.
6
             I fault HP and their legal team for not presenting a fair and reasonable settlement
7            for those that had been impacted by this intentional engineered design. HP
             decisions around the settlement were based purely on current short sided monetary
8            concerns rather than customer loyalty, righting a wrong and building confidence in
             the current and future HP customers. It is this attitude that has me tweaked the
9            most. In my office alone I have more than $20,000 (retail value when new) worth
             of HP products and feel as a customer, this was a slap in the face. I would much
10           rather leave my award to others and at least know that from this point forward I
             will not reward this unreasonableness with my future technology dollars to a
11           company more worthy.

12   McCarthy Dec., Ex. 1.

13   **VII.    THE OBJECTIONS ARE WITHOUT MERIT**

14       Out of over 13 million class members who were sent direct e-mail notice, only three have

15   filed objections.  None of the objections have merit.  Initially, these objectors are "professional

16   objectors."  Each objector here has objected to other class settlements.

17       **A.     Objectors Ignore that the Principal Benefit of this Settlement is Injunctive**

18               **Relief**

19       All three objections are based on the fundamental misconception that this Settlement is, at

20   essence, a "coupon" settlement.  It is not.  While the e-credits provide class members with a

21   substantial benefit[3], the primary benefit conveyed on the Class by the Settlement is significant

22   injunctive relief.

23       As discussed above, the *Ciolino*, *Rich*, and *Blennis* actions focus on alleged nondisclosure

24   of information about certain features of, and technology used in, HP's inkjet printers.  The

25   injunctive relief provided to the Settlement Class addresses the core complaint in each case by

26

27   [3]    Though the claims period does not close for many weeks, tens of thousands of claims have
            already been submitted.  Moreover, the claims administrator is currently processing the claims
28          of several institutional class members (such as schools), who stand to receive thousands, or
            tens-of-thousands of dollars in e-credits.

1    requiring HP to discontinue the use of certain pop-up messaging that includes the graphic image of

2    an ink gauge, ruler, or container of ink, and by requiring HP to disclose additional information

3    regarding the HP technology that forms the basis of the *Ciolino*, *Rich*, and *Blennis* actions on HP's

4    website (a location where HP customers already obtain information about and can purchase HP

5    printer products), and in the packaging, manuals, and/or user interfaces for HP inkjet printers.

6    These disclosures achieve the primary objective of the *Ciolino*, *Rich*, and *Blennis* actions.

7        Indeed, this injunctive relief represents a significant benefit to the class, which can be

8    roughly quantified, as indicated in the declaration of an economist, Dr, Allen Rosenfeld.

9        Dr. Rosenfeld concluded that injunctive relief, in this case, a change in business practices

10   that includes enhanced disclosures, has a measurable value.  Dr. Rosenfeld's report creates a

11   model for estimating that value for both current owners of HP printers and future owners (many of

12   them likely to be current class members updating their older HP printers).  In his model, Dr.

13   Rosenfeld assumes that there is some cost to consumers of the low on ink warnings at issue in

14   *Ciolino* (because HP's own documents concede that some consumers will replace ink cartridges in

15   response to a low on ink warning) and that cost will at a minimum be reduced some amount by the

16   business practice changes articulated in the parties settlement agreement.  Using conservative

17   estimates, Dr. Rosenfeld concludes the value of the injunctive relief falls with a range of $14-41

18   million.  *See* Expert Report of Allen Rosenfeld, Ph.D. ("Rosenfeld Report") (McCarthy Dec., Ex.

19   2).

20       Two of the objectors ignore altogether the injunctive relief provided in the Settlement

21   Agreement.  The third group of objectors, Theodore H. Frank and Kimberly Schratwieser

22   (represented by attorney Theodore H. Frank)[4], argues, in conclusory fashion, that the injunctive

23   relief "is worthless to the class as a matter of law."  Frank Objection at 10:13.  Citing Seventh

24   Circuit law, Frank argues that "The fairness of the settlement must be evaluated primarily based

25   on how it compensates class members for these past injuries."  *Id.* at 10:20-22 (quoting *Synfuel v.*

26   *BellSouth Telecommunications, Inc.*, 463 F.3d 646, 654 (7th Cir. 2006).  In the Ninth Circuit,

27

28   ---
     [4]    The caption of Mr. Frank's objection indicates that it is on behalf of "Adrian Monza" as well.
           However, the body of Mr. Frank's objection contains no reference to Monza, or any evidence
           that Monza is a class member.

1   however, there is no such rule.  Indeed, as Frank recognizes, *Hanlon*, the leading Ninth Circuit

2   case on approval of class action settlements, affirmed final approval of a settlement that provided

3   for **purely injunctive relief** – free replacement of certain latches on Chrysler minivans.[5]  *See*

4   *Hanlon*, 150 F.3d at 1027.

5       Frank attempts to distinguish *Hanlon* by arguing that in *Hanlon*, "the prospective relief,

6   provided free of charge, improved the lot of the class members:  before, they owned a defective

7   vehicle that they had allegedly paid too much for; afterwards, they owned a fixed vehicle." Frank

8   Objection at 11:15-18.  In contrast, Frank argues, in this case the injunctive relief "would be useful

9   only if a class member purchased ink or printers from HP in the future."  *Id.* at 11:23-24.

10      Frank's argument is wrong, for at least two reasons.  First, just as in *Hanlon*, the injunctive

11  relief in this case turns a "defective" product into a "fixed" product.  The essential "defect" in each

12  of these three cases is a lack of disclosure, or misrepresentations, to the consumer.  As described

13  above, the injunctive relief fixes those disclosures and misrepresentations.

14      Second, Frank is incorrect that the injunctive relief "would be useful only if a class

15  member purchased ink or printers from HP in the future."  Instead, the injunctive relief provides,

16  among other things, for additional disclosures on HP's website to the benefit of both existing and

17  future customers.  Those disclosures, according to Dr. Rosenfeld, have value.  *See* Rosenfeld

18  Report.  The injunctive relief of course will only be valuable to those who continue using their HP

19  printers, but the same is true of the settlement in *Hanlon*, which provided benefits only to those

20  who still owned – and continued to drive – a Chrysler minivan.  Thus Frank's argument that "The

21  class member will need to ***spend*** money to make the injunctive relief available to him," is akin to

22  criticizing the settlement in *Hanlon* because it would only provide benefits to those who were

23  willing to ***spend*** money on gasoline.[6]  Frank Objection at 11:24-25.

24      Frank next states that "these disclosures being blazoned as 'injunctive relief' would be

25  made by any prudent business looking to avoid further lawsuits regarding its business practices."

26  _____

27  [5]   Moreover, Frank ignores that it would be impossible to measure the amount by which each
        class member has been damaged in these cases.

28  [6]   Furthermore, nothing requires class members to buy HP ink in order to benefit from the
        injunctive relief.  There are many non-HP ink products that are compatible with the subject HP
        printers.

1   Frank Objection at 11:26-27.  Though the point of this statement is unclear, Plaintiffs agree that all

2   businesses should endeavor to avoid making material misrepresentations or omissions to the

3   consumers of their goods, and hope that these lawsuits and this settlement will encourage other

4   businesses to do so.

5          Finally, Frank argues that "the injunctive relief is only of value if HP voluntarily chooses

6   not to raise its prices to fully reflect the additional expense of changing its business practices."

7   Frank Objection at 12:2-5.  This argument is also wrong, for multiple reasons.  First, the same

8   argument could be made regarding any consumer class action settlement for injunctive relief –

9   indeed, regarding virtually any class action settlement at all.  For example, even if each class

10  member were receiving a $100 e-credit, Frank could argue that HP would simply recoup that sum

11  by raising its prices.  Second, as with his previous argument, Frank incorrectly presumes that

12  consumers must continue to patronize HP in order to receive benefits from the injunctive relief

13  provisions.  In fact, there are many non-HP ink products that consumers could use with the subject

14  printers.  Third, Frank's argument impliedly concedes that the negotiated injunctive relief has

15  value, by recognizing that requiring HP to change its business practices will cause it to incur

16  "additional expense."  Frank is correct, as described by Dr. Rosenfeld above.

17          **B.     In Light of the Significant Injunctive Relief, the Requested Attorneys' Fees are**

18                  **Reasonable**

19          Based on their unwarranted disregard of the value of the Settlement's injunctive relief

20  provisions, each of the objectors argues that Plaintiffs' request for attorneys' fees in excessive.

21  They are not.  First, approximately $600,000 of the $2.9 million request is for reimbursements of

22  costs expended.  Next, Plaintiffs' request for fees is reasonable both as (1) only 32% of Plaintiffs'

23  actual **lodestar** in these cases; and (2) between 7% and 20% of the total value of the settlement,

24  including at least $14 million to $41 million worth of injunctive relief.

25          Objectors assert that the $2.9 million request is excessive in light of the $5 million in e-

26  credits.  In support of this assertion, objectors cite 28 U.S.C. section 1712(a) of CAFA, which

27  provides:

28                  (a) Contingent fees in coupon settlements. If a proposed settlement in a

1  | class action provides for a recovery of coupons to a class member, **the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons** shall be based on the value to

2  | class members of the coupons that are redeemed.

3  | *Id.* (emphasis added).

4  | Plaintiffs' request for attorneys' fees, however, is not "attributable to the award" of the e-

5  | credits provided for in the Settlement. Instead, Plaintiffs' requests for attorneys' fees is based on

6  | the significant benefit to the class represented by the injunctive relief. Accordingly, subsection (b)

7  | of the very same provision of CAFA controls. It provides:

8  | (b) Other attorney's fee awards in coupon settlements.

9  |
10 | (1) In general. If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, **any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.**

11 |

12 | (2) Court approval. Any attorney's fee under this subsection shall be subject to approval by the court and **shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable**. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

13 |
14 |
15 |

16 | *Id.* § 1712(b) (emphasis added).

17 | In sum, this provision of CAFA explicitly requires the use of the lodestar approach in

18 | calculating fees that are based on securing meaningful injunctive relief for the class, as is the case

19 | here. This approach is consistent with preexisting Ninth Circuit case law. In *Hanlon*, for

20 | example, the trial court approved a $5 million fee award to class counsel, based on a settlement

21 | that provided pure injunctive relief. The Ninth Circuit affirmed the award, finding it reasonable

22 | both as a percentage of an estimate of the value of the injunctive relief ($115 million), and based

23 | on the attorneys' lodestar. 150 F.3d at 1029-30; *see also* 109 S. Rpt. 14 (2005) ("In some cases,

24 | the proponents of a class settlement involving coupons may decline to propose that attorney's fees

25 | be based on the value of the coupon-based relief provided by the settlement. Instead, the

26 | settlement proponents may propose that counsel fees be based upon the amount of time class

27 | counsel reasonably expended working on the action."). *See also Perez v. Asurion Corp.*, No. 06-

28 | 20734-CIV-SEITZ/MCALILEY, 2007 U.S. Dist. LEXIS 66931, at *4-5 (S.D. Fla. Aug. 8, 2007)

1  ("As CAFA's legislative history shows, this provision allows a district court to use the lodestar

2  method to calculate a reasonable attorneys' fee award in cases involving 'coupons;' the lodestar

3  method compensates counsel based on time reasonably expended rather than on the value of the

4  Class's recovery.  *See* S. REP. No. 109-14, at 31 (2005).")

5         A recent case from this District, *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC,

6  2008 U.S. Dist. LEXIS 112459, at *1 (N.D. Cal., Aug. 6, 2008), is instructive.  In *Fleury*, the

7  parties reached a settlement, the main benefit of which was $100 credits towards future services or

8  products.  *See id.* at *7-*8.  The settlement agreement also provided for an award of attorneys'

9  fees "in an amount not to exceed $2,000,000."  *Id.* at *3.  In determining whether the requested

10  amount was reasonable, the Court utilized the lodestar method, finding that doing so "is not

11  inconsistent with CAFA."  *Id.* at *12.

12         Following Ninth Circuit case law, the Court in *Fleury* then analyzed Plaintiffs' lodestar,

13  and found it reasonable.  *See id.* at *14-*21.  The Court summarized the Ninth Circuit's lodestar

14  approach as follows:

15                In most cases, the lodestar figure is presumptively a reasonable fee award,
                  although a court may, if circumstances warrant, adjust the lodestar upwards or
16                downwards to account for other factors -- as enumerated in *Kerr v. Screen Extras
                  Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) - which are not subsumed within the
17                lodestar.

18  *Fleury*, 2008 U.S. Dist. LEXIS 112459, at *15-*16 (emphasis added; footnotes omitted).

19         As in this case, several individuals objected to the requested attorneys' fees in *Fleury*

20  based on class members only receiving a "credit" for future services.  The Court considered and

21  rejected those objections, as follows:

22                [T]he Court has taken account objections that were made to the fee request but
                  none are availing.  For example, Andre Fleury has suggested that any significant
23                fee award would be excessive because the watchmaker subclass at least received
                  no real benefit from the settlement.  [citation]  Likewise, Larry Erhardt has argued
24                that any significant fee award would be excessive since a consumer is entitled to
                  only a $ 100 credit for each qualifying repair service. [citation]  However, the
25                Court has approved the settlement, both with respect to the watchmaker and
                  consumer subclasses, as fair, adequate, and reasonable, and **neither Andre Fleury
26                nor Larry Erhardt has made a showing that the hours spent by counsel, or the
                  hourly rates for counsel's services, are excessive**.  **Moreover, objectors have
27                not  demonstrated why the presumption that "results obtained" are
                  subsumed in the lodestar should not apply here.**

28

1   *Id.* at *20-*21.

2          Similarly, here, none of the objectors have made any showing that the hours spent by

3   counsel, or counsel's hourly rates, are excessive.  Even if they could, Plaintiffs' counsel are

4   seeking only a fraction of their total lodestar.  Accordingly, any duplicative or excessive hours or

5   rates would be accounted for in the reduced request.  Furthermore, as in *Fleury*, the objectors in

6   this case make no attempt to explain "why the presumption that 'results obtained' are subsumed in

7   the lodestar should not apply here."  *Id.*

8          Accordingly, Class Counsel's request for approximately $2 million in fees and $600,000 in

9   costs is reasonable, when viewed either as a percentage of the value of the injunctive relief ($14

10  million to $41 million), or as a fraction of Class Counsel's lodestar.

11         **C.      The Release is Not Overbroad**

12         Objectors Kahle and McDonald, and Schratwieser and Frank,[7] argue that the release

13  contained in the Settlement is overbroad.  It is not.  The release is limited to claims related to the

14  printer models that are the subject of these lawsuits, and explicitly excludes claims for personal

15  injury and claims under an express warranty.  *See* Settlement ¶ 21.

16         As a general rule, a release is proper in scope if it is limited to claims that were asserted or

17  that may arise out of the transactions or events pleaded in the  Class Action complaint.  4 Newberg

18  § 12:15, at p. 312 (and cases cited therein); *Class Plaintiffs*, 955 F.2d at 1297 (holding that a

19  release in conjunction with the settlement of a class action may properly release "not only those

20  claims alleged in the complaint, but also a claim based on the identical factual predicate as that

21  underlying the claims in the settled class action even though the claims was not presented and

22  might not have been presentable in the class action.")

23         Objector Frank complains that "the parties have failed to disclose whether there are other

24  class actions with other legal theories pending at this time that will be extinguished by the

25  settlement."  Frank Objection at 12:18-20.  Frank cites no authority in support of this argument,

26  but in any event, Class Counsel are unaware of any such pending class actions.  *See* McCarthy

27  _____

28  [7]   Notably, neither group of objectors point to any specific provision in the release that supports
      their position.  As such, their arguments appear to be boilerplate, borrowed from past
      objections.

1   Dec. ¶ 35.  Moreover, the various state attorneys general are aware of the proposed Settlement,

2   and none have objected.

3        **D.    All Three Objectors are Professional Objectors with No Experience**

4             **Prosecuting Class Actions**

5        It is important to note that all three groups that have filed objections to this Settlement are

6   represented by "professional objectors," who specialize in objecting to class action settlements,

7   either for pecuniary gain, or political motives.  McCarthy Dec. ¶ 36.  Attached to the McCarthy

8   declaration as Exhibit 3 is a list of just some of the class action in federal court to which these

9   professional objectors have objected.

10       As the authors of Newberg on Class Actions observe, the practice of filing objections to

11  proposed class action settlements has become, for some, "big business."  *See* 4 Newberg § 11:55,

12  at p.168.  To exemplify the problem, Newberg discusses *Shaw v. Toshiba America Information*

13  *Systems, Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000), in which the district court singled out

14  examples of "obviously 'canned' objections filed by professional objectors who seek out class

15  actions to simply extract a fee by lodging generic, unhelpful protests."  Shaw, 91 F.Supp.2d at

16  973-74; *see also O'Keefe v. Mercedes-Benz United States, LLC*, 214 F.R.D. 266 (E.D. Penn. 2003)

17  ("Federal courts are increasingly weary of professional objectors:  . . . *see In re Prudential*, 278

18  F.3d 175, passim (3d. Cir. 2002) (upholding § 1927 sanctions against a vexatious professional

19  objector); *Lobatz v. U.S. West Cellular of California, Inc.*, 222 F.3d 1142, 1147-48 (9th Cir. 2000)

20  (labeling the objector a "spoiler").

21       Similarly, Theodore Frank, of the "Center for Class Action Fairness," is admittedly

22  unconcerned with the benefits of class action settlements to consumers.  Instead, his goal, and the

23  goal of his organization, is to do away with class actions altogether.[8]  As such, his briefs in other

24
25  ---
    [8]    On his personal website, Frank touts himself as "a leading tort-reform advocate."  See
    McCarthy Dec., Ex. 5.  In a 2008 law review article, Frank stated his disdainful view of the
    civil justice system in general, as follows:

26
27         Litigation raises costs to the everyday consumer; Chrysler executives estimate that the
           cost of liability to domestic United States auto consumers today is about a thousand
           dollars a car.  The majority of expense in asbestos litigation goes to attorneys and
28         administration, rather than to victims of asbestos-related disease, and additional
           billions are siphoned off by uninjured plaintiffs bringing fraudulent claims or from the
           dozens of bankruptcies and thousands of jobs lost.  It appears the largely meritless

1   cases have been accurately described as "long on ideology and short on law." *Lonardo v.*

2   *Travelers Indem. Co.*, 706 F. Supp. 2d 766, 785 (N.D. Ohio 2010).  Similarly, here, Frank relies

3   largely on caselaw from other circuits, law review articles, and broad policy arguments to attack

4   the settlement.

5          Frank's Center for Class Action Fairness is not, as he represents to this Court, a small (3

6   lawyer), financially limited non-profit law firm.  *See* Frank Objection at 3.  Rather, documents

7   filed with IRS reveal that the Center is merely a "program" of a much larger entity called Donors

8   Trust Inc. ("Donors Trust").  *See* McCarthy Dec., Ex. 4.  Donors Trust provides funding to a range

9   of politically conservative groups. Grants provided by Donors Trust range in size from $1,000 to

10  $1.2 million.  In 2009, it's last reporting year, Donors Trust disclosed 477 grants to 154

11  organizations totaling approximately $17 million dollars.  By choice, the individuals and/or

12  corporations and foundations that fund Donors Trust are not publicly available.  Put simply, those

13  funders remain a secret.[9]

14         Frank discloses none of this information to the Court, and instead misrepresents the Center

15  as a stand-alone public interest law firm in compliance with IRS regulations.  This does not appear

16  to be the case.  Frank has created a fiction in order to distinguish himself from other professional

17  objectors.  His political agenda, however, merely makes him a professional objector of another

18

19         Vioxx litigation will also result in more money going from investors to attorneys than
       to those who suffered heart attacks.

20
       As litigation expands, and bet-the-company suits threaten even Fortune 500 companies,
21     recent law-school graduates earn over $200,000 per year in the defense bar, and multi-
       millionaire plaintiffs' attorneys hold annual Kozlowski-esque Christmas parties costing
22     more than three times that much.  There is nothing inherently wrong with conspicuous
       consumption qua conspicuous consumption, but in this case it is a symptom of a larger
23     problem. In terms of societal impact, at the margin, attorneys are rent-seekers or, at
       best, a transaction cost of navigating governmental regulation or performing the
24     redistribution of wealth; . . .  businesspeople and inventors are creating wealth through
       jobs and consumer surplus.  The extensive market demand for attorneys is entirely a
25     creation of government rules created by legislatures and the courts.  When the best and
       brightest are encouraged to devote their lives to the game show that American civil
26     litigation has become, the rest of us are deprived of the contributions they would have
       made as engineers, scientists or other innovators.

27     *Did the Right Make America a Lawsuit Nation? Thomas Geoghegan's See You In Court*, 12
       Tex. R. L. & Pol. 477, 516-17 (2008).
28  [9]  The Chairman of Donors Trust is:  Kimberly O. Dennis, President of the Searle Freedom
       Trust, and the Vice Chairman is James Piereson, President, William E. Simon Foundation.

1    sort – a political objector.  His agenda and failure to disclose his Center's true nature are relevant

2    to adjudging his credibility and the weight this Court should give his objection.

3         Notably, because of ulterior motives or lack of class litigation experience, none of the

4    objectors address the most critical *Hanlon* factors, such as the risk and costs of proceeding with

5    litigation, or the risk of failing to achieve and maintain class certification.  Without acknowledging

6    the long history of these cases, the adverse rulings from the Court, and the risks of moving

7    forward, the objections simply cannot be afforded any weight.  The California Court of Appeal's

8    comment in *Rebney v. Wells Fargo Bank*, 220 Cal. App. 3d 1117, 1140 (Cal. App. 1st Dist.1990)

9    is particularly apt here:

10              Appellants' counsel seem to think that megamillion-dollar victories would have
                been in the bag if only *they* had been permitted to try these cases.  But surely they
11              appreciate that nothing is assured when litigation against commercial giants with
                vast litigative resources, particular[ly] in such complex litigation as this . . . .
12

13   *Id.* (italics in original).

14        **E.      The Proposed Settlement Class Satisfies the Requirements of Rule 23**

15        In order to grant final certification of a settlement class, the requirements of Rule 23 must

16   generally be satisfied.  *See* Fed. R. Civ. P. 23; *Hanlon*, 150 F.3d at 1019.  The Court granted

17   conditional certification of the settlement class in this case at the preliminary approval stage.  For

18   the same reasons, summarized here, final certification is appropriate.

19        1.  Numerosity.  The proposed class meets the requirement of numerosity, in that it is

20   comprised of millions of members.  *See Hanlon*, 150 F.3d at 1019.

21        2.  Commonality.  The second prerequisite to class certification is the existence of

22   questions of law or fact common to the class.  Fed. R. Civ. P. 23 (a)(2).  The Ninth Circuit has

23   made clear that the commonality requirement is to be "construed permissively."  *Dukes v. Wal-*

24   *Mart, Inc.*, 603 F.3d 571, 559-600 (9th Cir. 2010).  Here, there are multiple common questions of

25   fact and law, as enumerated in the Motion for Preliminary Approval.

26        3.  Typicality.  The third prerequisite of typicality is also satisfied.  Here, proposed

27   settlement class representatives Feder, Ciolino, Rich, Duran, Blennis, and Brickner are typical of

28   the classes they seek to represent.  All six owned class printers and their claims are "reasonably

---

1  coextensive with those of absent class members." *Dukes*, 603 F.3d at 613. Neither Feder,

2  Ciolino, Rich, Duran, Blennis, nor Brickner has any conflicts of interest with the proposed class,

3  and they are represented by qualified and competent counsel. (McCarthy Decl., ¶¶ 4-7.)

4        4. Adequacy. The Named Plaintiffs will fairly and adequately protect the interests of the

5  class for purposes of this settlement. Plaintiffs in the various actions have retained counsel who

6  are qualified and experienced to litigate this action, and the Named Plaintiffs and Class Members

7  do not have antagonistic interests.

8        5. Rule 23 (b). The classes here satisfy not only Rule 23(b)(2) in that injunctive relief is

9  being provided respecting the class as a whole, but also Rule 23 (b)(3). Rule 23(b)(3) states that a

10  class may be certified when "questions of law or fact common to the members of the class

11  predominate over any questions affecting only individual members, and […] a class action is

12  superior to other available methods for the fair and efficient adjudication of the controversy."

13  These requirements are satisfied here.

14        The questions of law and fact common to all class members are set forth in the Motion for

15  Preliminary Approval. These common issues predominate over any individual issues such as the

16  nature and extent of damages. *See Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975), cert.

17  denied, 429 U.S. 816, 97 S. Ct. 57, 50 L. Ed. 2d 75 (1976). Additionally, a class action is clearly

18  superior to other available methods for the fair and efficient adjudication of the controversy

19  because joinder of all class members would be impracticable. Fed. R. Civ. P. 23 (b)(3).

20  Furthermore, because the damages suffered by individual members of the settlement class may be

21  relatively small, the expenses and burden of individual litigation would make it impossible for all

22  settlement class members to individually redress the harm done to them. *Id*.

23  **VIII.   CONCLUSION**

24        For the foregoing reasons, Plaintiffs respectfully request that the Court enter the

25  accompanying Proposed Order granting final approval of the proposed settlement.

26  DATED: January 14, 2011                    Respectfully submitted,

27                                   By:        */s/ Niall P. McCarthy*
                                               NIALL P. McCARTHY

28

1
*Counsel for Plaintiffs and the Settlement Class and*
*On Behalf of the Proposed Settlement Class*

2
Niall P. McCarthy
Justin T. Berger
3
COTCHETT, PITRE & MCCARTHY
San Francisco Airport Office Center
4
840 Malcolm Road, Suite 200
Burlingame, CA 94010
5
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
6
nmccarthy@cpmlegal.com
jberger@cpmlegal.com
7

Brian S. Kabateck
8
Richard L. Kellner
KABATECK BROWN KELLNER LLP
9
644 South Figueroa Street
Los Angeles, CA 90017
10
Telephone:  (213) 217-5000
Facsimile:  (213) 217-5010
11
bsk@kbklawyers.com
rlk@kbklawyers.com
12

Steven N. Berk
13
BERK LAW PLLC
1225 15th Street, N.W.
14
Washington D.C. 20005
Telephone:  (202) 232-7550
15
Facsimile:  (202) 232-7556
steven@berklawdc.com
16

Mark Andrew Chavez
17
CHAVEZ & GERTLER LLP
42 Miller Avenue
18
Mill Valley, CA 93941
Telephone:  (415) 381-5599
19
Facsimile:  (415) 381-5572
mark@chavezgertler.com
20

Jon Cuneo
21
CUNEO, WALDMAN & GILBERT LLC
317 Massachusetts Avenue
22
Suite 300
Washington, DC 20002
23
Telephone:  (202) 789-3960
Facsimile:  (202) 789-1813
24
jonc@cuneolaw.com

25
Marc Howard Edelson
EDELSON & ASSOCIATES LLC
26
45 West Court Street
Doylestown, PA 18901
27
Telephone:  (215) 230-8043
Facsimile:  (215) 230-8735
28
medelson@edelson-law.com

1

Stephen Garcia
THE GARCIA LAW FIRM

2

1 World Trade Center #1950
Long Beach, CA 90831-1950

3

Telephone:  (562) 216-5270
Facsimile:  (562) 216-5271

4

sgarcia@lawgarcia.com

5

Michael D. Liberty
LAW OFFICES OF MICHAEL D. LIBERTY

6

1290 Howard Avenue, Suite 303
Burlingame, CA 94010

7

Telephone:  (650) 685-8085
Facsimile:  (650) 685-8086

8

mdlaw@pacbell.net

9

Scott E. Shapiro
LAW OFFICE OF SCOTT E. SHAPIRO, PC

10

9701 West Pico Boulevard, Suite 110
Los Angeles, CA 90035

11

Telephone:  (310) 720-5501
Facsimile:  (310) 388-4612

12

scott.e.shapiro.esq@gmail.com

13

John Patrick McNicholas, IV
McNICHOLAS & McNICHOLAS LLP

14

10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024

15

Telephone:  (310) 474-1582
Facsimile:  (310) 475-7871

16

pmc@mcnicholaslaw.com

17

Bruce Simon
PEARSON, SIMON, WARSHAW & PENNY LLP

18

44 Montgomery Street, Suite 2450
San Francisco, CA 94104

19

Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008

20

21

Jonathan Shub
SHUBLAW LLC

22

1818 Market Street, 13th Floor
Philadelphia, PA 19106

23

Telephone: (610) 453-6551
Facsimile: (215) 569-1606

24

jshub@shublaw.com

25

David R. Buchanan
SEEGER WEISS LLP

26

One William Street
New York, NY 10004

27

Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

28

dbuchanan@seegerweiss.com