\*\*E-Filed 3/29/2011\*\*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| **IN RE HP INKJET PRINTER LITIGATION** | Case No. 5:05-cv-3580 JF<br><br>ORDER[1] RE PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES, REIMBURSEMENT OF COSTS AND EXPENSES, AND APPROVAL OF CLASS REPRESENTATIVES' STIPENDS<br><br>[re: docket no. 261, 271] |

Plaintiffs in three consumer class actions against Defendant Hewlett-Packard ("HP") seek an order granting final approval of a joint settlement agreement. They also move for attorneys' fees and costs and for approval of stipends for class representatives. While it concludes that the settlement is reasonable in light of the value of the asserted claims and has signed the parties' stipulated order approving the settlement itself, Docket No. 286, the Court will reduce the proposed award of attorneys' fees award for the reasons explained below.

## I. BACKGROUND

**A.    The Claims**

The proposed settlement resolves three separate cases, all of which involve HP's popular inkjet printer cartridges:

---

[1] This disposition is not designated for publication in the official reports.

1

### 1. The *Ciolino* Action ("Low-on-Ink" Warnings)

The *Ciolino* action was filed on September 6, 2005. It alleges that several lines of HP inkjet printers display "low-on-ink" warnings and graphics that indicate the need for a new ink cartridge when in fact the cartridge is not empty. On July 25, 2008, the Court denied HP's motion for summary judgment. While it described the evidence as "weak," the Court concluded that "a reasonable jury could find that [Plaintiffs] ha[ve] suffered a cognizable injury." In the same order, the Court denied Plaintiffs' request for certification of a nationwide class pursuant to Fed. R. Civ. Pro. 23(b)(2) because Plaintiffs' primary claim was for damages rather than injunctive relief. The Court also denied certification under Rule 23(b)(3) based on concerns about the manageability of a nationwide class in light of the differences in consumer protection laws among different states.

In the course of settlement negotiations, Plaintiffs accepted that not all "low-on-ink" messages were deceptive and claimed that the most confusing warnings were those with graphic images showing nearly empty cartridges. HP has agreed to eliminate those warnings.

### 2. The *Rich* Action (Underprinting)

The *Rich* Plaintiffs alleged that HP failed to disclose its practice of using color ink in addition to (considerably less expensive) black ink when printing black text and images (a practice called "underprinting"). On December 4, 2006, the Court granted HP's motion to dismiss Plaintiffs' First Amended Complaint. Plaintiffs' Second Amended Complaint deleted claims for breach of contract, breach of express and implied warranty, and breach of the implied covenant of good faith and fair dealing. Plaintiffs moved for certification of a damages class limited to California consumers and a nationwide class for purposes of injunctive relief. HP moved for summary judgment on the remaining claims. Neither motion was heard by the Court in light of the parties' settlement negotiations.

In the course of the negotiations, Plaintiffs acknowledged that underprinting is a legitimate technology that increases print quality; for its part, HP agreed to provide additional disclosures to consumers describing underprinting and measures that consumers can take to disable it.

### 3. The *Blennis* Action (Expiration Mechanisms)

The *Blennis* Plaintiffs alleged that HP has designed certain inkjet printers and cartridges to shut down on an undisclosed expiration date, preventing use of remaining ink. On March 25, 2008, the Court dismissed Plaintiff's claims for express warranty, implied warranty, trespass to chattels, and conversion. Plaintiffs subsequently filed for certification of a class consisting of "[a]ll persons or entities in the United States who owned one or more models of Hewlett-Packard inkjet printers that use ink cartridges that have an expiration date." Hearing on the motion was deferred in light of the parties' settlement discussions.

### B. Settlement Terms

#### 1. Disclosure

HP has agreed to enhance disclosure to consumers in three areas:

##### a. "Low-on-Ink" Warning

HP will discontinue the use of certain pop-up messages that include the graphic image of an ink gauge, ruler, or container of ink. It also has agreed to incorporate disclosures by means of its website, user manuals, and user interface explaining that low-on-ink messages are based on estimated ink levels and that users can continue to use an ink cartridge until they no longer are satisfied with the print quality or receive a "replace cartridge" message.

##### b. Underprinting

HP will include on its website and in its user manuals disclosures regarding "underprinting," including a description of what underprinting is, why it is used, and various options for disabling or minimizing its use. HP also will include disclosures regarding page yields, including a summary of its testing and an explanation that actual yield varies.

##### c. Expiration Mechanisms

HP will add disclosures on its website and product packaging with respect to ink cartridge expiration, including an explanation of the printers and cartridges that are subject to expiration, why HP uses expiration dates, how such dates are determined, and how ink expiration works.

**2.      E-Credits**

Members of the proposed Settlement Class will receive direct relief in the form of an electronic credit for HP printer products, subject to satisfying eligibility requirements. Class members must apply for these e-credits using an online claim form, and there is an overall cap of $5,000,000 for this aspect of the settlement. Each participating class member in the *Ciolino* action who meets the eligibility requirements may receive up to $5.00 in e-credits for each applicable printer. In order to be eligible, claimants must provide proof of ownership and declare that they (a) received a "low-on-ink" message, (b) believed that they were out of ink as a result of the message, and (c) removed the ink cartridge after receiving the message without using the remaining ink. Similarly, each participating member in the *Blennis* action who meets the eligibility requirements may receive up to $6.00 in e-credits for each applicable model. To be eligible, members must provide proof of ownership and declare that they purchased an inkjet cartridge that reached the ink expiration date before the cartridge was fully used. Participating members of the *Rich* class only need provide proof of ownership to be eligible for an e-credit of up to $2.00.

**C.      Other Costs and Attorneys' Fees**

HP has agreed to pay for the class notice and costs of administration not to exceed $950,000. HP also has agreed, subject to court approval, to pay a stipend of not more than $1,000 to each named plaintiff in each case. It also has agreed to pay attorneys' fees and costs not to exceed $2,900,000. In exchange, HP will be released from all claims related to the *Ciolino*, *Rich*, and *Blennis* actions.

**D.      The Claims Process**

The Court preliminarily approved the settlement on October 1, 2010. Notice was sent by email to more than thirteen million class members. In addition, notice was published in various magazines and on internet sites. Approximately eight hundred class members opted out of the proposed settlement, and only five have filed formal objections. The deadline to submit claims expired on February 15, 2011. As of March 10, 2011, the settlement administrator had received 122,410 claims for 202,176 printers. Based on these claims, the administrator has approved e-

credits as follows: (1) 53,147 e-credits for *Blennis* Affected Models with a total value of $318,882.00; (2) 148,479 e-credits for *Ciolino* Affected Models with a total value of $742,395.00; and (3) 202,176 e-credits for *Rich* Affected Models with a total value of $404,352.00. Settlement Administrator's Decl. ¶ 4. In all, $1,465,629.00 in e-credits have been approved. *Id.*

## II.  LEGAL STANDARD

Where "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

### A.    Class Certification

In order to bring a class action, a plaintiff must demonstrate that (1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties fairly and adequately will protect the interests of the class ("adequacy of representation").

A class-action plaintiff also must satisfy one of the prongs of Rule 23(b). Where, as here, class certification is sought under Rule 23(b)(3), the plaintiff must prove that:

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Facts pertinent to these findings include: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum. Fed. R. Civ. P. 23(b)(3).  The fourth factor, "the difficulties likely to be encountered in the management of a class action," need not be considered when class certification is for settlement purposes only. Fed. R. Civ. P. 23(b)(3)(D); *Amchem Prods., Inc. v.*

5
Case No.
ORDER RE APPLICATION FOR ATTORNEYS' FEES, ETC.
(JFLC3)

*Windsor*, 521 U.S. 591, 620 (1997).

**B.      Adequacy of the Settlement**

Before approving a settlement, the court must hold a hearing and find that "the settlement . . . is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C).  Review of a proposed settlement generally proceeds in two stages, a hearing on preliminary approval and a final fairness hearing.  *See* Federal Judicial Center, Manual for Complex Litigation, § 21.632 (4th ed. 2004).

At the preliminary approval stage, the court determines whether a proposed settlement is "within the range of possible approval" and whether or not notice should be sent to class members.  *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 205 (5th Cir. 1981); *see also* Manual for Complex Litigation § 21.632.  At the final approval stage, the court takes a closer look at the proposed settlement, taking into consideration objections and any other further developments in order to make a final fairness determination.  *True v. Am. Honda Motor Co.*, No. EDCV 07-0287-VAP, 210 U.S. Dist. LEXIS 23545, at *16-*17 (C.D. Cal. February 26, 2010).

In determining whether a settlement is fair, reasonable, and adequate, a court must balance several factors, including:

> the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992) (citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)); *see also In re Heritage Bond Litig.*, 546 F.3d 667, 674 (9th Cir. 2008).  However, this is "by no means an exhaustive list of relevant considerations," and "[t]he relative degree of importance to be attached to any particular factor will depend on the unique circumstances of each case."  *Officers for Justice*, 688 F.2d at 625.

In evaluating a proposed settlement, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness."  *Hanlon v. Chrysler*

6

Case No.
ORDER RE APPLICATION FOR ATTORNEYS' FEES, ETC.
(JFLC3)

*Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). The court "does not have the ability to delete, modify, or substitute certain provisions," and "[t]he settlement must stand or fall in its entirety." *Id.* The question is not whether the settlement "could be prettier, smarter, or snazzier," but solely "whether it is fair, adequate, and free from collusion." *Id.* at 1027.

### III. DISCUSSION

**A.   Certification of the class**

In its order granting preliminary approval of the instant settlement, this Court found conditionally that, for settlement purposes, the prerequisites for a class action under Rules 23(a) and (b)(3) have been satisfied in that: (a) the number of settlement class members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the settlement class; (c) the claims of the Plaintiffs are typical of the claims of the settlement class they seek to represent for purposes of settlement; (d) the Plaintiffs have fairly and adequately represented the interests of the settlement class and will continue to do so, and the Plaintiffs have retained experienced counsel to represent them; (e) for purposes of settlement, the questions of law and fact common to the settlement class members predominate over any questions affecting any individual settlement class member; and (f) for purposes of settlement, a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.

As noted earlier, in addressing a motion for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems. *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997). This Court's order denying nationwide class certification for the *Ciolino* action was based primarily on issues of manageability that are not present in the settlement context. While the order also reflected the Court's concerns about the desirability of litigating the suit under California law in light of the diverse state consumer protection laws implicated by Plaintiff's claims, "variations in state law do not necessarily preclude a 23(b)(3) action" as long as the plaintiffs can "demonstrate the commonality of substantive law applicable to all class members." *Hanlon v. Chrisler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). In this case, as in *Hanlon*, there is no indication that the

differences in state consumer protection laws outweigh the commonalities. Moreover, because the damages suffered by individual members of the settlement class are small, the expenses and burdens of individual litigation would make it difficult for settlement class members to seek redress individually.

**B.      Adequacy of Settlement**

    **1.      Value of the settlement in light of the strength of Plaintiffs' case**

Each of the objectors to the proposed settlement contends that the settlement provides insufficient relief for the class. The objectors calculate that there are approximately a hundred million members of the settlement class, making the true value of the $5 million in e-credits not more than five cents per class member. In addition, they observe that the e-credits effectively are coupons worth much less than their cash value and that coupon settlements are inherently problematic.

    **a.      Proposed settlement as a coupon settlement**

The Class Action Fairness Action (CAFA) includes specific requirements with respect to the approval of a "coupon settlement." While the statute does not define the term "coupon settlement," courts have identified such a settlement as one in which the relief consists of "a discount on another product or service offered by the defendant in the lawsuit." *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 U.S. Dist. LEXIS 112459, at *9 (N.D. Cal. Aug. 6, 2008). CAFA requires that before a district court may approve a "coupon settlement," it must "determine whether, and mak[e] a written finding that, the settlement is fair, reasonable, and adequate for class members." 28 U.S.C. § 1712(e). Although the "fair, reasonable, and adequate" language used in section 1712(e) is identical to the language relating to settlement approval contained in Rule 23(e)(2), several courts have read § 1712(e) as imposing a heightened level of scrutiny in reviewing such settlements. *See, e.g.*, *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006); *True v. Am. Honda Motor Co.*, No. EDC 07-0287-VAP, 2010 U.S. Dist. LEXIS 23545, at *35 (C.D. Cal. Feb. 26, 2010).

These courts have articulated three primary concerns with "coupon settlements": "they often do not provide meaningful compensation to class members; they often fail to disgorge

Case No.
ORDER RE APPLICATION FOR ATTORNEYS' FEES, ETC.
(JFLC3)

1  ill-gotten gains from the defendant; and they often require class members to do future business
2  with the defendant in order to receive compensation." *True*, 2010 U.S. Dist. LEXIS 2345, at*36
3  (quoting *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1302 (S.D. Fla. 2007)).
4  Nonetheless, such settlements have been approved as fair, adequate, and reasonable, after
5  consideration of the value of the relief offered in the settlement and the claims on which the
6  settlement is based. *Id.* at * 36; *see, e.g.*, *In re Mexico Money Transfer Litigation*, 267 F.3d 743,
7  748-49 (7th Cir. 2001) (Easterbrook, J.) (approving a coupon settlement, even though it found
8  the relief offered was "more in the nature of a PR gesture . . . than an exchange of money (or
9  coupons) for the release of valuable legal rights," because the underlying "claims had only
10 nuisance value").

  **b.**  **Value of the e-credits**

  While Plaintiffs attempt to distinguish e-credits from coupons, the credits plainly serve as discounts on products offered by defendants. Moreover, even if e-credits could be distinguished from coupons under CAFA, the statutory provisions are instructive when the benefit to the class is coupon-like. *Fleury*, 2008 U.S. Dist. LEXIS 112459, at *11. The objectors contend that all of the problems with coupon settlements are present in the instant case. They claim that the e-credits, which are non-transferable and cannot be used with other discounts or coupons, do not provide meaningful compensation to class members. In addition, they contend that rather than requiring HP to disgorge ill-gotten gains, the credits act as a marketing technique to drive class members to the company's website to purchase HP products directly.

  The objectors' concerns about the e-credits are valid. The fact that the credits are nontransferable, redeemable only at HP.com, and cannot be used with other coupons or discounts significantly reduces their cash value. In many ways, the e-credits are indistinguishable from a marketing technique HP might employ to attract consumers to its commercial website. While Plaintiffs observe correctly that class members using HP printers continue to incur costs for ink and other products sold at HP.com, the nontransferable e-credits are of value only to those class members who continue to use HP printers and who do not have

access to a less expensive supply of ink cartridges.[2]

### c.     Value of injunctive relief

Plaintiffs contend that the primary benefit of the settlement is the injunctive relief obtained. Indeed, their economist opines that the value of the injunctive relief falls within a range of $16-41 million. Rosenfeld Report at 7. However, the objectors argue that the injunctive relief in this case is "worthless as a matter of law." Frank Objection at 10. Objectors make the obvious point that prospective relief provides no compensation for past harm. They rely on *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). In that case, a shipping company was alleged to have overcharged customers on shipping envelopes. The proposed settlement included operational changes that the plaintiffs claimed would result in savings for class members. The court discounted the value of such relief because it only would benefit future customers of the shipper rather than remedying the injuries to past consumers. The court noted that "the fairness of the settlement must be evaluated primarily based on how it compensates class members for . . . past injuries." *Id.*

Plaintiffs point out that the Ninth Circuit has expressly recognized the value of prospective relief. In *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1997), the principal case upon which they rely, the court found that the settlement was adequate because the primary concern of the plaintiffs--the safety of Chrysler minivans–was addressed by injunctive relief. Plaintiffs argue that the principal problem in this case–customer confusion caused by misleading warnings–also is addressed by the proposed injunctive relief. It is true that for those customers who have been confused by HP's warnings in the past the greater clarity provided by the settlement may be useful, and it is reasonable to assume that there will be significant overlap between class members who were confused by the warnings and those who will benefit from the discontinuation of such warnings in new HP printers.

However, while injunctive relief is of *some* value to the class, Plaintiffs provide little

---

[2] Objectors point out that at least one major retailer provides discounts on ink cartridges when consumers recycle empty cartridges, and claim that these discounts are of greater monetary value than the proposed e-credits.

10
Case No.
ORDER RE APPLICATION FOR ATTORNEYS' FEES, ETC.
(JFLC3)

support for their generous estimate of the economic value of such relief. Plaintiffs' expert admits that "the percentage of printer owners that had been discarding their ink cartridges immediately when they as the [low-on-ink] message, but would be alerted successfully by the web warnings mandated by the injunctive relief, is unknown." Rosenfeld Report at 5. While Plaintiffs' expert proposes a range of twenty to eighty percent to model possible outcomes, in fact the percentage just as easily could be much smaller. It is doubtful that the consumers most likely to have been confused by a "low-on-ink" warning would access the HP website each time such a warning occurs. In addition, while Plaintiffs acknowledge that the graphic low-on-ink warnings are the most misleading, the settlement does not include any requirement that HP provide additional clarification in graphic form. Although elimination of the graphic warnings on printers purchased after the implementation of the settlement may have a significant impact, Plaintiffs acknowledge that the "extent to which former HP printer owners continue to purchase HP printers is unknown." Rosenfeld Report at 6. Ultimately, Plaintiffs' expert report is not particularly helpful to the Court in its determination of the value of the injunctive relief to the Settlement Class.

### d. Strength of Plaintiffs' case

Despite these evident problems with the proposed settlement, the limited value of the relief obtained must be considered in relation to the strength of Plaintiffs' claims in the first instance. The objectors uniformly fail to address this question. As the Court has observed repeatedly over the course of the litigation, even assuming that Plaintiffs could prove that HP's "low-on-ink" warnings were inaccurate or misleading, the task of determining whether the warnings actually confused consumers or resulted in the unwarranted disposal of a significant amount of ink necessarily involves a great deal of speculation. The underprinting at issue in *Rich* and the expiration date at issue in *Blennis* involve similar challenges with respect to proof. This Court denied nationwide class certification in *Ciolino*, and HP has indicated that it also would contest certification of a California class were that case to proceed. The parties have engaged in intensive motion practice and extensive discovery, and there is no reason to believe that the posture of any of the cases would improve through further litigation.

11
Case No.
ORDER RE APPLICATION FOR ATTORNEYS' FEES, ETC.
(JFLC3)

1   Moreover, even if the Plaintiffs could prove their claims at trial, the damages recoverable
2   by each individual class member still would be very modest. According to Plaintiffs' own
3   analysis, only about two-percent of HP inkjet printer owners replace their ink cartridges
4   prematurely due to low-on-ink warnings. McCarthy Decl. Ex 2 at 4 ("Rosenfeld Report").
5   Among those consumers, the amount of ink that otherwise would be used before print quality
6   was affected appears virtually impossible to determine.

   **2.  The arm's-length negotiation of the settlement, the experience and views of counsel, and the reaction of class members.**

   The Ninth Circuit has ruled that courts may "put a good deal of stock in [class settlements that are] the product of arm's-length, non-collusive, negotiated resolution." *Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Here, retired California Superior Court Judge James L. Warren, who served as a mediator for the settlement discussions, has provided a declaration stating that the settlement discussions were conducted in good faith and at arm's-length. Warren Declaration ¶ 5.

   Where there is no evidence of fraud or collusion, courts give great weight to the recommendation of counsel in light of their intimate acquaintance with the facts at issue. *Nat'l Rural Telecomms.*, 221 F.R.D. at 528. In this case, both Plaintiffs' counsel and counsel for HP are experienced in class action litigation. After vigorously litigating the case over several years, counsel on both sides believe that the settlement is fair, adequate, and reasonable.

   Finally, the Court considers the reaction of class members to the proposed settlement. More than thirteen million class members received e-mail notice regarding the settlement. As may be expected in such a settlement, the overwhelming majority did not respond at all. Approximately eight hundred people excluded themselves from the settlement, and only a handful filed objections. On the other hand, approximately 122,000 class members filed claims. Danielson Decl ¶ 3. This factor favors approval of the proposed settlement.

   Because the settlement was arrived at as a result of arms-length, non-collusive negotiations, and the value of the settlement is reasonable in light of the evident weakness of the case and the modest value of Plaintiffs' claims, the Court will approve the settlement agreement.

**C.    Attorneys' Fees**

Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties agreement." Fed.R.Civ.P. 23(h). Plaintiffs request attorneys' fees of $2,303,009.30 and costs of $596,990.70. HP has agreed to pay attorneys' fees and costs up to $2,900,000. In light of the settling parties' agreement, the principal question for the Court is what constitutes a reasonable attorneys' fee. *See Wing v. Asarco, Inc.*, 114 F.3d 986, 988 (9th Cir.1997) (noting that the parties' settlement agreement providing for an award of attorney's fees did not limit the district court's discretion in determining the fee).

In their brief in support of their motion for attorneys' fees, Plaintiffs quote this Court out of context for the proposition that "[a] court should refrain from substituting its own value for a properly bargained-for agreement." Pls. Br. in Supp. of Mot. Atty. Fees at 18:4-5 (quoting *In re Apple Computer, Inc. Derivative Litig.*, 2008 U.S. Dist. LEXIS 108195, at *12 (N.D. Ca. Nov. 5, 2008). While courts in this circuit regularly have afforded a presumption of fairness to non-collusive settlement, the same deference is not appropriate in considering the fairness of an award of attorneys' fees. *See Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) ("That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need to carefully scrutinize the fee award."); *Create-A-Card, Inc. v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at *2 (N.D. Cal. Sept. 22, 2009) ("It is clearly within the Court's discretion to award less in fees than the amount sought by counsel, even absent defendant's objection to the requested amount."). The Court remains responsible for ensuring that any fee award is fair and reasonable. *Wing v. Asarco, Inc.*, 114 F.3d 986, 988 (9th Cir. 1997).

The Ninth Circuit "has affirmed the use of two separate methods for determining attorneys' fees, depending on the case": the percentage method and the lodestar method. *Hanlon*, 150 F.3d at 1029. Under CAFA, "[i]f a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class

1  members of the coupons that are redeemed." 28 U.S.C. § 1712(a); *see also Fleury*, No. C-05-
2  4535 EMC, 2008 U.S. Dist. LEXIS 112459 (N.D. Cal. Aug. 9, 2008).  CAFA also provides that
3  "[i]f a proposed settlement in a class action provides for a recovery of coupons is *not* used to
4  determine the attorney's fees to be paid to class counsel, any attorney's fee shall be based upon
5  the amount of time class counsel reasonably expended working on the action." 28 U.S.C. §
6  1712(b)(1) (emphasis added).  Any fee approved under 28 U.S.C. § 1712(b) "shall be subject to
7  approval by the court and shall include an appropriate attorney's fee, if any, for obtaining
8  equitable relief." 28 U.S.C. § 1712(b)(2).

9        Plaintiffs assert that class counsel have incurred $7,109,247.09 in fees representing more
10 than 17,000 hours of time spent on litigation.  Counsel indicate that their work has included (1)
11 depositions of a dozen witnesses, (2) production of hundreds of thousands of documents, (3)
12 more than a hundred written discovery requests, (4) inspection of several of the printers at issue,
13 (5) consultations with industry personnel, (6) extensive work with experts, including the design
14 and implementation of independent testing; (7) numerous interviews of witnesses and putative
15 class members; (8) evaluation of information provided by current or former employees of HP
16 (including the HP engineers with primary responsibility for the design of some of the HP inkjet
17 printer models at issue); and (9) legal research as to the sufficiency of the claims.  McCarthy
18 Decl. ¶ 9.

19       Plaintiffs do not seek this entire amount.  Instead, they seek fees of approximately $2.3
20 million, or about thirty-two percent of the lodestar figure, along with about $600,000 in costs.
21 While this amount is acceptable to HP, this Court still must determine independently if it is fair.
22 A number of factors go into this determination, *see Kerr v. Screen Actors Guild, Inc.*, 526 F.2d
23 67, 70 (9th Cir. 1975) (listing factors), but the "key consideration in determining a fee award is
24 reasonableness in light of the benefit *actually conferred*." *Create-A-Card, Inc.*, 2009 WL
25 3073920, at *3.

26       Here, the settlement administrator indicates that approximately $1.5 million in e-credits
27 have been approved.  As discussed above, the actual cash value of these non-transferrable credits
28 is significantly less than $1.5 million.  At the same time, the discount in the cash value of the e-

credits is mitigated by value of the injunctive relief achieved by the settlement.  While the monetary value of such relief is uncertain, and the Court believes that Plaintiffs' assessment of that value is significantly inflated, Plaintiffs were successful in persuading HP to discontinue, at least for three years, a practice that allegedly misled a significant number of consumers.  While no precise value can be placed on the settlement in light of the many uncertainties involved, the Court is satisfied that the ultimate value of the settlement to the class is roughly $1.5 million.

Plaintiffs' request for attorneys' fees exceeds that amount by more than half a million dollars.  While there is no question of collusion in this case, and the Court has no reason at all to doubt that counsel put in the hours they claim, the extent to which an attorneys' fee award exceeds the value of the settlement to the class is problematic, particularly given the "coupon" nature of the settlement.  As Judge Alsup noted under similar circumstances, "[t]o allow the immediate parties to stipulate to pay class counsel a large sum whether or not a large benefit was conferred on the class–and indeed even when it was not–would encourage collusive settlements. . . . Tethering fees (in part) to benefit will help guard against collusion in the general run of cases."  *Create-a-Card*, 2009 WL 3073920, at *4.  In addition, while this case was extensively litigated over several years, the Court still has serious questions as to whether consumers actually incurred significant injury from HP's actions.  To allow an award of attorneys' fees to outstrip the benefit to consumers in such cases would undermine the importance of focusing the efforts of class-action counsel on issues that most affect consumers.

Accordingly, Plaintiffs will be awarded attorney's fees of $1,500,000, plus $596,990.70 in costs.

**D.    Class representative stipends**

In *Stanton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003), the Ninth Circuit recognized that "named plaintiffs . . . are eligible for reasonable incentive payments." *Id.* at 977.  The settlement agreement provides for $1,000 incentive awards to the class representatives.  These awards are reasonable in light of the time and effort put in by the named Plaintiffs throughout the litigation.

### IV.  ORDER

Because it finds and concludes that the proposed settlement is fair and reasonable, the

15

1  Court will grant final approval and has been signed the parties' proposed settlement order, which
2  is filed concurrently herewith.  Pursuant to the foregoing discussion, Plaintiffs are awarded
3  attorneys' fees in the amount of $1,500,000, plus $596,990.70 in costs, and incentive payments
4  of $1,000 for each class representative.

6  DATED: March 29, 2011

   _____
   JEREMY FOGEL
   United States District Judge

Case No.
ORDER RE APPLICATION FOR ATTORNEYS' FEES, ETC.
(JFLC3)